687 So.2d 156 (1996)
Cindy McCULLAR
v.
UNIVERSAL UNDERWRITERS LIFE INSURANCE COMPANY, et al.
1930246.
Supreme Court of Alabama.
November 22, 1996.
*159 J. Michael Tanner and Benjamin H. Albritton of Almon, McAlister, Ashe, Baccus & Tanner, Tuscumbia; and J. O. Isom, Hamilton, for Appellant.
Danny D. Henderson and Clint W. Butler of Spurrier, Rice & Henderson, Huntsville, for Regency Chevrolet-Olds, Inc., E.B. Pinkerton and Roger Guin.
S. Dagnal Rowe and Alan P. Judge of Burr & Forman, Huntsville, for Universal Underwriters Life Ins. Company.
Garve Ivey of Wilson & King, Jasper, for amicus curiae Alabama Trial Lawyers Association.
M. Roland Nachman of Balch & Bingham, Montgomery, for amicus curiae Consumer Credit Insurance Association.
Sabrina Andry Simon of Lightfoot, Franklin, White & Lucas, Birmingham; and Richard E. Barnsback and Phillip E. Stano, American Council of Life Insurance, Washington, DC, for amicus curiae American Council of Life Insurance.
Counsel on application for rehearing:
J. O. Isom, Hamilton; J. Michael Tanner of Almon, McAlister, Ashe, Baccus & Tanner, Tuscumbia; Garve Ivey, Jr. of King & Ivey, Jasper; and Barry A. Ragsdale of King & Ivey, Birmingham, for appellant.
Danny D. Henderson of Henderson & Butler, Huntsville, for Regency Chevrolet-Olds, Inc., E.B. Pinkerton and Roger Guin.
S. Dagnal Rowe, Alan P. Judge, William F. Murray, Jr., F. A. Flowers III, and Robert H. Rutherford of Burr & Forman, Birmingham and Huntsville, for Universal Underwriters Life Ins. Company.
Lanny S. Vines and Michael L. Allsup of Emond & Vines, Birmingham; for amicus curiae Alabama Trial Lawyers Association.
Cathy S. Wright of Maynard, Cooper & Gale, P.C., Birmingham, and Phillip E. Stano, American Council of Life Insurance, Washington, DC, for amicus curiae American Council of Life Insurance.
Robert A. Huffaker of Rushton, Stakely, Johnston & Garrett, P.A., Montgomery, for amicus curiae Automobile Dealers Ass'n of Alabama, Inc.
Matthew C. McDonald of Miller, Hamilton, Snider & Odom, L.L.C., Mobile, for amicus curiae Alabama Retailers Ass'n.
John R. Chiles and Richard H. Sforzini, Jr. of Sirote & Permutt, P.C., Birmingham, for amicus curiae Alabama Financial Services Ass'n.
John M. Galese, Birmingham, for amicus curiae Independent Automobile Dealers Ass'n.
Dennis Pantazis of Gordon, Silberman, Wiggins & Childs, Birmingham, for amicus curiae American Automobile Manufacturers Ass'n.
John R. Chiles of Sirote & Permutt, P.C., Birmingham, for amicus curiae Alabama Lenders Ass'n.
H. Hampton Boles and Teresa G. Minor of Balch & Bingham, Birmingham, for amicus curiae Alabama Bankers Ass'n.
*160 Michael A. Bownes, General Counsel, for amicus curiae Alabama Department of Insurance.
Scott Corscadden, General Counsel, Alabama State Banking Department, for amici curiae Alabama State Banking Department and Superintendent of Banks Kenneth R. McCartha.

On Application for Rehearing
COOK, Justice.
The opinion of September 29, 1995, is withdrawn and the following opinion is substituted therefor.
The plaintiff, Cindy McCullar, appeals from a summary judgment for the defendants in her fraud action. McCullar alleged that when she bought an automobile Universal Underwriters Life Insurance Company and the dealership, Regency Chevrolet-Olds, Inc., acting through the dealership's employees, fraudulently sold her more credit life and disability insurance than she needed. She sued the Regency dealership and two of its employees, seeking damages for the alleged fraud; she also sued Universal Underwriters Life Insurance Company, which issued the credit life and disability policies, seeking to impose liability against that defendant on an agency theory.
McCullar alleged in her complaint:
"10. The selling of credit life insurance and the premium charged for credit life insurance [are] regulated by the Department of Insurance for the State of Alabama. The regulations in effect on May 28, 1990, provided [that] the amount of credit life insurance sold shall never exceed the approximate unpaid balance of the loan. The premiums allowed to be charged for credit life insurance are based upon the amount of insurance sold.
"11. The amount of credit life insurance sold by the defendants to the plaintiff in this instance and the premiums charged for that credit life insurance [were] in direct violation of the Department of Insurance regulations in that the amount of insurance sold at all times exceeded the approximate unpaid balance of the loan. As a result, the premiums charged for said insurance exceeded the maximum allowed by the regulations of the Alabama Department of Insurance.
". . . .
"13. The defendants were guilty of fraud, deceit, and/or misrepresentation to the plaintiff in the sale of this credit life insurance in that the defendants represented to plaintiff that the amount of credit life insurance sold was the amount needed; the defendants represented to plaintiff that they were authorized to sell to her that amount of credit life insurance; the defendants failed to disclose to plaintiff that the amount of credit life insurance sold was more than was needed to pay off the balance of the loan and was in violation in the Department of Insurance regulations governing the sale of credit life insurance. Plaintiff did not discover this fraud until November of 1992. Plaintiff relied on these misrepresentations to her detriment by purchasing more credit life insurance than was needed or allowed and incurring [the expense of] additional premiums for the purchase of the excessive amount of credit life insurance."
Alan McCullar and his wife Cindy McCullar purchased a new Oldsmobile Cutlass Ciera automobile from Regency in May 1990. The purchase price was $14,248.19. The McCullars paid $1,500 down, leaving an unpaid balance of $12,748.19, which the couple intended to finance. During the transaction, Regency employees E.B. Pinkerton and Roger Guin, acting as agents for Universal, sold the McCullars credit life and credit disability insurance on Alan McCullar. The total cost of the insurance$1,037.10 for the credit life insurance and $1,306.75 for the credit disability insuranceincreased the balance to $15,108.54. The McCullars signed a contract to pay that amount, plus precomputed interest, totaling altogether $20,742.00, over 60 months at payments of $345.70 per month.
The McCullars divorced in 1990. Cindy McCullar received title to the car as part of the divorce settlement, and she made the monthly payments until she defaulted on the loan.
On May 7, 1993, McCullar sued Universal, Regency, and Regency employees Pinkerton *161 and Guin (Regency, Pinkerton, and Guin will be referred to together as "Regency") in the Marion County Circuit Court, alleging fraud. McCullar charged that Regency sold the credit life insurance with a premium based on $20,742.00, the total amount of the contract, instead of a premium based on $15,108.54, the amount financed under the contract. She alleged that doing this allowed Regency and Universal to charge a higher premium for credit life insurance, $1,037.10 rather than $755.45, and, similarly, allowed them to charge a higher-than-necessary premium for disability coverage. Further, McCullar asserts that Regency did not tell her that the amount of insurance the McCullars were purchasing was more than would be needed to pay off the debt in the event of Alan McCullar's death. With her complaint, McCullar simultaneously filed a request for production of documents, seeking discovery of information relating to Universal policies sold by Regency. Universal and Regency timely answered, denying the charges, and, on August 16, 1993, they moved for a summary judgment.
On August 17, 1993, Regency requested that the court set a hearing date on the summary judgment motion. The court set a September 21, 1993, hearing date, over McCullar's objection. She asked the court to delay the hearing, saying she had not completed discovery. The court entered a summary judgment for Universal and Regency on October 19, 1993. McCullar appeals.
McCullar raises two issues on appeal. First, she argues that the court should not have entered the summary judgment without giving her an opportunity to conduct what she considered crucial discovery. Second, she argues that she had shown a genuine issue of material fact that made a summary judgment improper.
McCullar first argues that the trial court should have delayed the summary judgment hearing because she had discovery pending. We first acknowledge that a trial judge has broad discretion to grant or to deny a motion for a continuance. Wood v. Benedictine Society of Alabama, Inc., 530 So.2d 801, 805 (Ala.1988). Continuances are not favored; therefore, the trial court's denial of a continuance will not be reversed except for an abuse of discretion. Selby v. Money, 403 So.2d 218, 220 (Ala.1981).
It is established that the mere pendency of discovery does not bar the entry of a summary judgment. Reeves v. Porter, 521 So.2d 963 (Ala.1988). If the trial court, from the evidence before it, or the appellate court, from the record, can ascertain that the matter subject to production, or the answers to pending interrogatories, are crucial to the nonmoving party's case, then it is error for the trial court to enter a summary judgment before the items have been produced or the answers given. Reeves, 521 So.2d at 965. The burden of showing that these items are crucial is upon the nonmoving party, who can carry that burden by complying with Ala. R.Civ.P. 56(f), which reads:
"(f) When Evidentiary Matter is Unavailable. If a party opposing the motion shows by affidavit that he or she cannot, for reasons stated in the affidavit, present facts essential to justify a statement in opposition, the court may deny the motion for summary judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."
See Reeves, 521 So.2d at 965 (quoting an earlier version of Rule 56(f)).
McCullar asserts that Regency and Universal did not respond to her request for production of documents and that she did not have the opportunity to depose Harland Dyer or Roger Floyd, who supplied affidavits for those defendants. But she has not met her burden of proving how information from them is crucial to her case. Although McCullar contended to the trial court that, without the requested documents, she could not properly depose Dyer and Floyd, nothing in the record indicates that she specifically told the court why the discovery was significant to her effort to rebut the summary judgment motion. McCullar has not explained to this Court why her discovery requests were so important that the trial court should have delayed the hearing on the summary judgment motion. Therefore, we must *162 conclude that the trial court, in denying the motion for a continuance, did not abuse its broad discretion. The burden is on the nonmoving party to comply with Rule 56(f), or to otherwise prove that the matter sought by discovery is or may be crucial to the nonmoving party's case. McCullar did not do this; thus, we find no error in regard to McCullar's first argument.
McCullar next argues that she had presented a genuine issue of material fact and thus that the summary judgment was improper. An appellate court reviews a summary judgment by the same standard employed by the trial court when it rules on a summary judgment motion. Southern Guaranty Ins. Co. v. First Alabama Bank, 540 So.2d 732 (Ala.1989). A summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ala.R.Civ.P. 56(c)(3). Like the trial court, the appellate court views the evidence, and resolves all reasonable doubts, in favor of the nonmovant. Specialty Container Mfg., Inc. v. Rusken Packaging, Inc., 572 So.2d 403 (Ala.1990). The burden is on a party moving for a summary judgment to show that no genuine issue of material fact exists; once the movant makes a prima facie showing that no genuine issue of material fact exists, the burden shifts to the nonmovant to rebut the prima facie showing. McClendon v. Mountain Top Indoor Flea Market, Inc., 601 So.2d 957 (Ala.1992).
McCullar argues that there was a genuine issue of material fact as to whether the defendants committed fraud in regard to her purchase of insurance. She claims that Regency deceived her by basing the credit life and credit disability insurance premiums on the unpaid balance of the purchase price plus interest, instead of basing the premiums on the unpaid balance alone. Regency counters with the argument that calculating the insurance premium as it did is within the law. Regency submitted affidavits from Roger Floyd, supervisor of the Alabama Banking Department's Bureau of Loans, and Harland Dyer, an employee of the Alabama Department of Insurance, to rebut McCullar's claim.
Floyd is one of the administrators responsible for enforcing that body of statutory law commonly called the "Mini-Code," Ala.Code 1975, §§ 5-19-1 to -31. The superintendent of banks is authorized under § 5-19-21 to make regulations necessary to enforce the Mini-Code. Rule 4(a) of the Department of Insurance regulations provides that all insurance offered pursuant to § 5-19-20 must comply with the Department's rules and regulations. Section 5-19-20 states:
"(a) With respect to any credit transaction, the creditor shall not require any insurance other than insurance against loss of or damage to any property in which the creditor is given a security interest and insurance insuring the lien of the creditor on the property which is collateral for said transaction. Credit life and disability and involuntary unemployment compensation insurance may be offered and, if accepted, may be provided by the creditor. The charge to the debtor for any such insurance shall not exceed the authorized premium permitted for such coverages. Insurance with respect to any credit transaction shall not exceed the approximate amount and term of the credit."
Floyd testified that the premium for decreasing term credit life insurance can be written for the total of payments due on add-on/precomputed-interest credit sales transactions. Such a premium he said, does not have to be calculated solely on the principal amount of the credit transaction. C.R. 31.
Harland Dyer is an actuary who interprets the insurance laws. He testified that the State Banking Department interprets the phrase "amount ... of credit" to mean the "total of payments" on an "add-on/precomputed-interest" credit transaction and that this interpretation is consistent with the Insurance Department's Regulation No. 28, Section III(A) and (B). C.R. 67. Section III(B), which addresses "individual credit life insurance," reads:
"The amount of Individual Credit Life Insurance written under one or more policies issued by the same lender shall not exceed the original face amount of the specific *163 contracts of indebtedness in connection with which it is written; provided, however, that where the indebtedness is repayable in substantially equal installments, the amount of insurance shall never exceed the approximate unpaid balance of the loan."
McCullar attempted to rebut the testimony of Dyer and Floyd with testimony from Robert H. Harrison, a Compass Bank vice-president licensed to sell credit life insurance policies in connection with financing automobile purchases. Harrison testified that McCullar's unpaid loan balance, when the loan was made in May 1990, was $15,108.54 and that to sell her life insurance based on $20,742 was to exceed what Regulation 28 allowed, because, he said, under that regulation the amount of insurance could "never exceed the approximate unpaid balance of the loan," when the repayment is made in "substantially equal installments."
The conflicting testimony brings into question the agency's interpretation of the statute. The interpretation placed on a statute by the executive or administrative agency charged with its enforcement is given great weight and deference by a reviewing court. Alabama Metallurgical Corp. v. Alabama Public Service Comm'n, 441 So.2d 565 (Ala. 1983); Hulcher v. Taunton, 388 So.2d 1203, 1206 (Ala.1980); Employees' Retirement System v. Oden, 369 So.2d 4 (Ala.1979); Moody v. Ingram, 361 So.2d 513 (Ala.1978). "[T]he interpretation of an agency regulation by the promulgating agency carries "`controlling weight unless it is plainly erroneous or inconsistent with the regulation."` United States v. Larionoff, 431 U.S. 864, 872 [97 S.Ct. 2150, 2155, 53 L.Ed.2d 48] (1977) (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 [65 S.Ct. 1215, 1217, 89 L.Ed. 1700] (1945))." Brunson Constr. & Environmental Services, Inc. v. City of Prichard, 664 So.2d 885, 890 (Ala.1995).
This Court must interpret plain language in a statute to mean exactly what it says. Coastal States Gas Transmission Co. v. Alabama Public Service Comm'n, 524 So.2d 357 (Ala.1988). Words should be given their natural, plain, ordinary, and commonly understood meaning. Alabama Farm Bureau Mutual Cas. Ins. Co. v. City of Hartselle, 460 So.2d 1219 (Ala.1984). This is especially true in a case like this, given the overall legislative intent behind the Mini-Code. The Mini-Code, § 5-19-1 through § 5-19-31, was enacted by the legislature to provide a comprehensive consumer finance law. Holcomb v. Henderson Nat'l Bank, 399 So.2d 850 (Ala.Civ.App.1981). The aim is to protect the consumer. Spears v. Colonial Bank, 514 So.2d 814 (Ala.1987); Derico v. Duncan, 410 So.2d 27 (Ala.1982). The intention of the legislature was to include all creditors within the applicability of the Mini-Code, regardless of their status as banks, credit unions, or some other form of organization. McCartha v. Iron & Steel Credit Union, 373 So.2d 328 (Ala.Civ.App.1979).
Section 5-19-20 provides that insurance on a "credit transaction shall not exceed the approximate amount ... of the credit." Department of Insurance Regulation 28 provides that the amount of insurance written "shall not exceed the original face amount of the specific contracts" and that where repayment is made "in substantially equal installments, the amount of insurance shall never exceed the approximate unpaid balance of the loan." Here, there can be no dispute that the natural, plain, ordinary, and common meanings of the terms "amount ... of credit," "original face amount," and "unpaid balance of the loan" all refer to $15,108.54, the amount McCullar had to borrow to pay the balance she owed on the car plus any accumulated interest. This amount, according to the contract, is $15,108.54, the total amount resulting from adding to the unpaid balance of the cash price the cost of the credit life and credit disability insurance premiums (i.e., $12,748.19 + $2,360.35 = $15,108.54). It contravenes the plain language of the statute to interpret the phrase "amount ... of credit" to mean the "total of payments" on an add-on/precomputed-interest credit transaction. The interest, or the cost of borrowing money, is not "fixed," when considered in comparison to the cost of purchasing the automobile. For example, if Alan McCullar had died before the couple made the first installment, the insurer would not have paid $20,742.00 to pay off the loan. Subsequent to that first payment, the insurer, in the event *164 of Alan McCullar's death, would have paid only the balance plus interest accrued to that point. The only way the insurer might have had to pay $20,742.00 to pay off the initial loan of $15,108.54 would have been for the couple to miss all payments for 60 months and then for Alan McCullar to diebut the policy language avoids such liability for the insurer. The legislature, when it passed this consumer protection statute, did not intend to allow a lender to base an insurance premium on an amount that the insurer would never be called upon to pay to satisfy the loan in the event of death. Therefore, we hold that the State Insurance Department's interpretation of its Regulation 28, as enforced by the State Banking Department via that Department's Rule 4(a), is inconsistent with the plain meaning of § 5-19-20(a). The original face amount of the specific contract of indebtedness does not include the interest that would be paid under an add-on/precomputed-interest credit transaction. "Insurance with respect to any credit transaction shall not exceed the approximate amount" that an insurer would be called upon to pay under the terms of the agreement. § 5-19-20. We note that credit disability policies insure a risk based on the total of payments provided for in the purchaser's contract; therefore, this holding is not applicable to those policies, but is restricted to credit life insurance policies.
Regency and Universal's assertion that they sold McCullar credit life and disability insurance in a manner consistent with the State Insurance Department's interpretation of Regulation 28 does not dispose of the fraud question. McCullar specifically asserts (1) that Regency told her the amount of insurance she purchased was the amount needed to pay off the debt on the car in the event of Alan McCullar's death; (2) that she relied on Regency's statements in deciding how much life insurance to purchase; (3) that at no time did Regency tell her that the pay-off on the car loan was actually less than the amount of the insurance she was purchasing. McCullar claims that she did not discover that she had purchased more life insurance than she needed to until November 1992, two and one half years after she had purchased it.
"Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud." Ala.Code 1975, § 6-5-101 (emphasis added). Fraud includes four elements: (1) There must be a false representation; (2) the false representation must concern a material existing fact; (3) the plaintiff must rely upon the false representation; and (4) the plaintiff must be damaged as a proximate result of the reliance. Harmon v. Motors Ins. Corp., 493 So.2d 1370, 1373 (Ala.1986). We cannot ascertain from the record whether Regency disclosed to McCullar any information relevant to the insurance and banking laws, the cost of premiums allowed, or the type of installment loan contract to which McCullar agreed. Thus, there is a genuine issue of material fact as to whether Regency acted fraudulently with regard to the credit life and credit disability insurance it sold McCullari.e., as to whether it misrepresented the coverage she received as being the amount needed to cover the principal loan balance in the event of Alan McCullar's death.
Whether Regency's actions constituted fraud under Ala.Code 1975, § 6-5-101, is a question of fact for the jury. Therefore, we reverse the summary judgment. However, because of the peculiar nature of this class of case, namely, where the defendants have fashioned their sales of credit life insurance so as to sell coverage equal to the total amount of payments due under the contract, and have done so based upon the interpretation of the State Insurance Department, we determine that the species of fraud under which a plaintiff can assert a claim is that of an "innocent/mistaken" misrepresentation.
On application for a rehearing, the appellees request that our holding regarding the State Insurance Department's interpretation of its Regulation 28, as enforced by the Banking Department's Rule 4(a) be made prospective only, should this Court not change the result of the opinion from original deliverance. In effect, the appellees argue that they relied on the interpretation and *165 construction of the statute rendered by the State Insurance and Banking Departments and that any change by this Court should be made to apply only in the future.
Although circumstances occasionally dictate that judicial decisions should be applied prospectively, James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 536, 111 S.Ct. 2439, 2443-44, 115 L.Ed.2d 481 (1991), retroactive application of judgments is "overwhelmingly the norm[al]" practice. Id. at 535, 111 S.Ct. at 2443. Retroactivity "is in keeping with the traditional function of the courts to decide cases before them based upon their best current understanding of the law.... It also reflects the declaratory theory of law, ... according to which the courts are understood only to find the law, not to make it." Id. at 535-36, 111 S.Ct. at 2443.
The United States Supreme Court has suggested consideration of the following factors in choosing whether to apply a judicial decision prospectively:
"First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, see, e.g., Hanover Shoe, Inc. v. United Shoe Machinery Corp., [392 U.S. 481, 496, 88 S.Ct. 2224, 2233, 20 L.Ed.2d 1231 (1968)] ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed, see, e.g., Allen v. State Board of Elections, [393 U.S. 544, 572, 89 S.Ct. 817, 835, 22 L.Ed.2d 1 (1969)]. Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' Linkletter v. Walker, [381 U.S. 618, 629, 85 S.Ct. 1731, 1737-38, 14 L.Ed.2d 601 (1965)]. Finally, we have weighed the inequity imposed by retroactive application, for `[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the "injustice or hardship" by a holding of nonretroactivity.'"
Chevron Oil Co. v. Huson, 404 U.S. 97, 106-07, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971).
Under Alabama law, the first of these factors will, in many cases, prove dispositive of the issue. This conclusion follows from Ala.Const. 1901, § 13, which provides in pertinent part: "That all courts shall be open; and that every person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law ..." This provision prevents, among other things, the abrogation by the legislature or this Court of a cause of action that has vested. Kruszewski v. Liberty Mut. Ins. Co., 653 So.2d 935 (Ala.1995); Murdock v. Steel Processing Servs., Inc. 581 So.2d 846 (Ala.1991); Yarchak v. Munford, Inc., 570 So.2d 648 (Ala.1990), cert. denied, 500 U.S. 942, 111 S.Ct. 2237, 114 L.Ed.2d 478 (1991); Reed v. Brunson, 527 So.2d 102 (Ala.1988); Barlow v. Humana, Inc., 495 So.2d 1048 (Ala.1986); Mayo v. Rouselle Corp., 375 So.2d 449 (Ala.1979); Pickett v. Matthews, 238 Ala. 542, 192 So. 261 (1939). A cause of action has vested if it has accrued at the time of the legislation or the judgment. It accrues "when a person sustains a legal injury upon which an action can be maintained." Cantrell v. Stewart, 628 So.2d 543, 545 (Ala. 1993).
Essentially, then, the retroactivity issue turns on the extent to which a judicial decision affects pending or potential causes of action or preexisting rights. A decision may create or destroy existing causes or rights, see Roberts v. M & R Properties, Inc., 612 So.2d 432, 439 (Ala.1992) (applying prospectively a judicial rule abrogating the right of a "tax-deed purchaser" to collect "interim taxes pursuant to the assignment provision in [Ala.Code 1975,] § 40-10-135"); or it may simply declare an existing principle of law. Legal injuries based on existing principles of lawas declared by decisions of the latter varietyare vested as of the date of the decision. Because such injuries are actionable as of the date of the decision, they are protected by § 13. For a number of reasons, it is apparent that this case is of the latter variety.
First, it is undisputed that the provision of § 5-19-20(a) at issue in this case has not, heretofore, been construed by any Alabama *166 appellate court. Thus, it cannot be contended that we have "overrul[ed] clear past precedent." Huson, 404 U.S. at 106, 92 S.Ct. at 355. Nor does this opinion set forth a new rule. A "case does not announce [a] new rule unless it indicates `that the issue involved was novel, that innovative principles were necessary to resolve it, or that the issue had been settled in prior cases in a manner contrary to the view held by [the Court].'" Reynoldsville Casket Co. v. Hyde, 514 U.S. 749,___, 115 S.Ct. 1745, 1754, 131 L.Ed.2d 820 (1995) (Kennedy, J., concurring; quoting Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 496, 88 S.Ct. 2224, 2233, 20 L.Ed.2d 1231 (1968)).
Second, this opinion does not construe § 5-19-20(a) in any esoteric fashion, but, rather, according to its plain meaning. Thus, it can hardly be contended that our interpretation "was not clearly foreshadowed." 404 U.S. at 106, 92 S.Ct. at 355. For these reasons, claims based on interpretations consistent with this opinion and arising out of occurrences antecedent thereto, if not barred by the statute of limitations, must be deemed to be vested and subject to § 13 protection.
Moreover, the goal of the Mini-Code is "the protection of the public, specifically, the consumer/debtor." Derico v. Duncan, 410 So.2d 27, 31 (Ala.1982); see also Spears v. Colonial Bank of Alabama, 514 So.2d 814, 816 (Ala.1987). A retroactive application of this opinion will tend to effectuate that goal. See Huson, 404 U.S. at 107, 92 S.Ct. at 355-56.
Having weighed these and other considerations, we decline to apply the rule of this case prospectively only. The cause is remanded for proceedings consistent with this opinion.

OPINION WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; REVERSED AND REMANDED.
ALMON and SHORES, JJ., concur.
KENNEDY and BUTTS, JJ., concur in the result.
HOUSTON, J., concurs in the result to reverse, but disagrees with the rationale of the lead opinion.
HOOPER, C.J., concurs in part and dissents in part.
MADDOX, J., dissents (Justice MADDOX's dissenting opinion follows the appendix to Chief Justice HOOPER's special opinion).
HOUSTON, Justice (concurring in the result to reverse, but disagreeing with the rationale of the lead opinion).
I agree with the dissenting portions of Chief Justice Hooper's special opinion, but I disagree with that portion of his opinion styled: "IX. FURTHER DISCOVERY."
The lead opinion states that "[t]his Court must interpret plain language in a statute to mean exactly what it says" and that "[w]ords should be given their natural, plain, ordinary, and commonly understood meaning." 687 So.2d at 163. I certainly thought that that was our standard of review (see John Deere Co. v. Gamble, 523 So.2d 95, 99-100 (Ala. 1988)). For a thorough discussion of this rule of statutory construction, see Justice Maddox's dissent in Roe v. Mobile County Appointment Board, 676 So.2d 1206 (Ala. 1995). It appears that a majority of this Court again accepts the plain meaning rule of statutory construction.
"Insurance with respect to any credit transaction shall not exceed the approximate amount and term of the credit." Ala.Code 1975, § 5-19-20. What is the plain meaning of this sentence of the statute? Neither "credit" nor "credit transaction" nor "approximate amount ... of the credit" is defined in § 5-19-1 (the "Definitions" section of the Mini-Code).
After discussing this sentence with my staff for one hour, consulting law dictionaries, and consulting all of Chapter 19 of Title 5, Ala.Code 1975, I have come to one conclusion: I do not know what the natural, plain, ordinary, and commonly understood meaning of that sentence is.
In interpreting the last sentence of § 5-19-20, Department of Insurance Regulation 28 provides that the amount of credit insurance *167 written "shall not exceed the original face amount" of the specific contract. I cannot say that the sentence could not be interpreted that way. The face amount of the contract at issue is $20,742. Regulation 28 further provides that "where the indebtedness is repayable in substantially equal installments [as it was in this case], the amount of insurance shall never exceed the approximate unpaid balance of the loan." I do not believe that it did in this case. I cannot say that the last sentence of § 5-19-20 could not be interpreted that way. The face amount of the credit insurance policy, $20,742, is the same as the face amount of the credit contract. Each month, as payments are made on the contract, the amount owed on the contract and the amount that the credit life and disability insurance policies will pay in the event of death or a covered disability reduce by the same amount.
The summary judgment was entered based upon the affidavits of Roger Floyd and Harland Dyer. Their affidavit testimony was disputed by the affidavit of Robert H. Harrison. Normally, this would be enough to defeat the defendants' motion for summary judgment; certainly, it is enough to make McCullar's requested deposition of Floyd and Dyer crucial to McCullar's case. Therefore, under Reeves v. Porter, 521 So.2d 963, 965 (Ala.1988), I would hold that it was reversible error for the trial court to grant the defendants' motion for summary judgment without giving McCullar the opportunity to cross-examine Floyd and Dyer.
Therefore, while I disagree with the rationale of the plurality opinion, both as to the procedural ruling regarding discovery and as to the substantive ruling regarding the insurance premium, I agree that the judgment should be reversed.
HOOPER, Chief Justice (concurring in part and dissenting in part).
I would grant the application for rehearing. I was not a member of this Court when it first considered this case. I would have dissented from that first opinion insofar as it related to the fraud issue, and in that regard I dissent from the substitute opinion issued today. I dissent because that opinion labels as fraud an accounting practice common in the insurance industry, one that has been used and approved for approximately 25 years; because it interprets as clear a statute that is at best ambiguous; because it demands punishment of companies that had no idea their practice was improper; and because it springs a surprising new cause of action upon those companies, in violation of state and federal due process guarantees.
The question in this case was whether the credit life insurance coverage amount used by Universal Underwriters and Regency Chevrolet-Olds, Inc., to determine the premium to be paid by the McCullars was excessive. The plurality has determined that there exists a genuine issue of material fact as to that question, even though the method used by Universal Underwriters to determine that premium has been the common business practice of insurers not only in the State of Alabama, but also throughout the country. It is a business practice that was approved by the State of Alabama Banking Department and the State Insurance Department, the very agencies charged with interpreting the state statute the plurality uses to call into question the insurance provided by Universal Underwriters. It is a business practice that has been accepted as a legitimate method of accounting for credit life insurance in at least 42 states of this country and approved in their statutes and by their regulatory agencies. The amount of the insurance was disclosed to the McCullars at the time of the purchase; there was nothing hidden or concealed from them when they purchased the car and the amount of credit insurance necessary to cover the purchase. The amount insured was what was needed for this kind of loan contract.
What motive would Universal Underwriters or Regency Chevrolet-Olds have to hide from the McCullars the "true" amount of credit life insurance "necessary" to cover their purchase when the amount considered necessary to cover such a purchase was an amount allowed by the state regulatory agencies and was used by most other dealers in the State of Alabama and the rest of the country? The defendants in this case had no reason to hide from the McCullars what was *168 a perfectly acceptable, common, and legal practice. If asked by these purchasers what amount of credit life insurance was needed to cover their purchase, the defendants would have honestly and legitimately responded, "You need an amount that will cover the total of the payments for this car." And that is exactly what the plaintiffs received. To conclude otherwise is not to properly apply the law to the facts. To call this transaction fraud is not only ridiculous, it borders on being inventive. I commiserate with the defendants in this case. Justice Almon in a 1981 dissent expressed the surprise a defendant might feel in a case in which this Court had invented fraud where none existed before: "As Alice said, `Dear, dear! How queer everything is today! And yesterday things went on just as usual. I wonder if I've changed in the night.'" Chavers v. National Security Fire & Casualty Co., 405 So.2d 1, 14 (Ala.1981). I am sure that this expressed what Universal Underwriters and Regency Chevrolet-Olds felt the day after the plurality's original opinion was released. One day they were engaged in a legitimate business practice. The next day they woke up to learn they were engaged in fraud. There is no basis for labelling as fraud the practice of calculating the amount of credit life insurance based on the "total of payments" necessary to make the purchase. The defendants' summary judgment was entirely appropriate and should be affirmed.

I. FRAUD
Ala.Code 1975, § 6-5-100 states, "Fraud by one, accompanied with damage to the party defrauded, in all cases gives a right of action." Ala.Code 1975, § 6-5-101 states, "Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud." Fraud requires proof of four elements: "(1) There must be a false representation; (2) the false representation must concern a material existing fact; (3) the plaintiff must rely upon the false representation, and; (4) the plaintiff must be damaged as a proximate result." Carter v. Innisfree Hotel, Inc., 661 So.2d 1174 (Ala.1995); Harmon v. Motors Insurance Corp., 493 So.2d 1370, 1373 (Ala.1986).

A. THE PLURALITY OPINION
The plurality explains its rationale for finding potential fraud by stating that there are certain factors that Regency did not comply with:
"We cannot ascertain from the record whether Regency disclosed to McCullar any information relevant to the insurance and banking laws, the cost of premiums allowed, or the type of installment loan contract to which McCullar agreed. Thus, there is a genuine issue of material fact as to whether Regency acted fraudulently with regard to the credit life and credit disability insurance it sold McCullari.e., as to whether it misrepresented the coverage she received as being the amount needed to cover the principal loan balance in the event of Alan McCullar's death."
687 So.2d at 164. Must a defendant offer evidence of these factors in order to defend against fraud claims? Or are these factors somehow related to the elements necessary for a plaintiff to prove fraud? The opinion does not explain. Was Regency required to disclose to the McCullars some information about the insurance and banking laws before charging them the standard industry rate for credit life insurance? Why would Regency have to defend itself when Regency knew of no reason to be criticized for charging this amount of credit life insurance? Only one of the factors stated in the plurality opinion seems to be relevant to the issue of whether Regency misrepresented the amount of credit life insurance needed by the McCullars. That factor is whether the amount of the credit life insurance premium was disclosed. It was disclosed.

I.B. WHAT THE RECORD SAYS
Having read the record, I conclude that the sales contract with Regency appears to have set forth the terms clearly. In the sales contract, under "Federal Truth-In-Lending Disclosures," the block entitled "Total of Payments" contains the amount $20,742.00. In the block at the bottom left corner of the front page entitled "Credit Life," taking up a *169 space that is impossible for a reader to miss, the premiums are listed for both the credit life and the credit disability insurance $1,037.10 and $1,306.75. Beside the subblock listing the premium for the credit life insurance is another subblock with the words "I want credit life insurance." Directly beside that subblock is another subblock with the signature of the buyer, "Alan McCullar." The same signature and the same format appear with the disclosure of the credit disability insurance premium. This sales contract was entered into the record.
The credit life insurance policy is also explicit. It states who should receive payment in the event the policy amount paid is greater than the debt owed. This is a distinct possibility because when the policy is written, no one knows if or when the debtor might die or become disabled. Therefore, there is no way to know exactly how much excess coverage might exist on the date the debtor dies. The policy clearly covers this contingency. First, the excess is paid to the debtor's secondary beneficiary. Of course, the creditor is the primary beneficiary of the policy because the amount owed is paid directly to the creditor to cover the debt. If there is no secondary beneficiary, then the excess is paid to the debtor/insured's estate. This raises the question of what damage the McCullars suffered as a result of purchasing this insurance. Cindy McCullar defaulted on the car payments. It is not clear how she could have made a claim upon a contract for insurance that is in default.
The "Motor Vehicle Installment Contract" states that the 60 monthly payments will be the same each month, $345.70. The total amount of the payments, $20,742.00, is clearly listed on the contract. Therefore, this is an installment contract involving equal monthly installments. The interest rate and the amount of interest that would be paid over a 60-month period are clearly listed. This is a standard consumer motor vehicle sales contract. I know of no additional information needed to decide what statute and regulation governed this particular installment contract. I do not know what more would need to be disclosed to the McCullars in order for Regency to avoid the fraud claim. The opinion does not explain in what way these facts were not disclosed. Nor does it explain what additional information should have been disclosed to the customer in order for Regency to be successful on a summary judgment motion. Are dealers now required to give purchasers some type of lesson in financing and on what state law allows? If Regency had done so in this case, it would have told the McCullars that the total-of-payments method is an acceptable method of determining the necessary amount of life insurance to cover an add-on/precomputed interest contract.

I.C. WHAT THE EXPERTS SAY
Although the factors cited above, regarding what the plurality says Regency should have disclosed to the McCullars, are juxtaposed with the conclusion that Regency may have acted fraudulently, the opinion directs more attention to another issue, and for good reason. The issue of the legality of the credit insurance policy is fatal to the plaintiff's claim. It is clear from the affidavits of Mr. Dyer, consulting actuary for the State of Alabama Department of Insurance, and Mr. Floyd, supervisor of the Bureau of Loans for the State of Alabama Banking Department, that Regency and Universal in no way violated Ala.Code 1975, § 5-19-20 (part of the Mini-Code) or State Department of Insurance Regulation No. 28, § III(A) and (B). The State Banking Department is the agency charged under the Mini-Code with making the regulations and rules under which the Mini-Code is administered. The plurality opinion states that the agencies have misinterpreted the statute. The agencies have interpreted the statute and the regulation this particular way for approximately 25 years. Their interpretation is correct, and it is in accord with the rule in a majority of the states of this country. (See Appendix.) Even if the agencies had misinterpreted the statute, Regency and Universal, who have relied on the agencies' interpretation for years, should not be charged with fraud, because they misrepresented nothing to the McCullars. Why would they try to misrepresent something that to their knowledge was completely legitimate and in accord with Alabama law and regulations?
*170 Judge Cherner of the Tenth Judicial Circuit of Alabama faced almost identical facts in a case in 1986. One piece of history indicating how long credit insurance has been issued as a "total of payments" type of policy in the State of Alabama is that case, Payne v. Ford Motor Credit Co. and Belcher Motor Co. (Jefferson Circuit Court, CV-83-5010601, August 18, 1986). In that case, Judge Cherner entered a summary judgment. Mr. Floyd provided an affidavit in that case that is almost identical to the affidavit he provided in this case. Judge Cherner noted the importance of courts' giving deference to administrative agencies and their interpretation of statutes, quoting a very appropriate statement from a decision of the United States Court of Appeals for the Fifth Circuit:
"But it is an axiom of judicial review that an administrative agency's interpretation of its own regulations must be accorded the greatest deference. Udall v. Tallman, 1965, 380 U.S. 1, 16-17, 85 S.Ct. 792, 801, 13 L.Ed.[2d] 616, rehearing denied, 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283; Bowles v. Seminole Rock & Sand Co., 1945, 325 U.S. 410, 413-414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700, 1702. When, as here, that interpretation obviously incorporates quasitechnical administrative expertise and a familiarity with the situation acquired by long experience with the intricacies inherent in a comprehensive regulatory scheme, judges should be particularly reluctant to substitute their personal assessment of the meaning of the regulation for the considered judgment of the agency. If the agency interpretation is merely one of several reasonable alternatives, it must stand even though it may not appear as reasonable as some other."
Allen M. Campbell Co. General Contractors, Inc. v. Lloyd Wood Construction Co., 446 F.2d 261 (5th Cir.1971). How does the plurality opinion stand up to that standard? Not very well.

II. "THE APPROXIMATE AMOUNT AND TERM OF THE CREDIT"
Section 5-19-20 states:
"(a) With respect to any credit transaction, the creditor shall not require any insurance other than insurance against loss of or damage to any property in which the creditor is given a security interest and insurance insuring the lien of the creditor on the property which is collateral for said transaction. Credit life and disability and involuntary unemployment compensation insurance may be offered and, if accepted, may be provided by the creditor. The charge to the debtor for any such insurance shall not exceed the authorized premium permitted for such coverages. Insurance with respect to any credit transaction shall not exceed the approximate amount and term of the credit."

The Banking Department determines the "authorized premium permitted for such coverages." Department Regulation No. 28, § III(B) reads:
"The amount of Individual Credit Life Insurance written under one or more policies issued by the same lender shall not exceed the original face amount of the specific contracts of indebtedness in connection with which it is written; provided, however, that where the indebtedness is repayable in substantially equal installments, the amount of insurance shall never exceed the approximate unpaid balance of the loan."
The plurality opinion states that the words "approximate unpaid balance of the loan" can mean only the principal owed, not including interest. The wording of the regulation does not explicitly refer to the principal amount of the loan only, in such a way that this Court should ignore the opinions of the responsible agencies. The common understanding of a person asked, "How much do you have left to pay on your car loan?" is that the answer would include principal and interest. I cannot imagine the McCullars subtracting out the interest when asked what they still owed on their car before this lawsuit was filed. Assuming there exists a conflict as to the meaning of this term, where should this Court turn for guidance? This Court should consult the administrative agencies responsible for overseeing this entire subject. The representative of the Insurance Department and the supervisor of the Bureau of Loans for the Banking Department state that their interpretation shows that Regency and Universal *171 complied fully with the law and the regulation. That is how their agencies have interpreted the statute and the regulation for years.
Notice that § 5-19-20(a) makes no distinction between credit life insurance and credit disability insurance, which the plaintiffs have conceded should be treated differently from credit life insurance. The plaintiffs admit that issuers of credit disability insurance may use the total of payments to determine the amount of insurance. Yet that statute uses the same terminology for both types of credit insurance to define the limit upon the amount of insurance allowed"approximate amount and term of the credit." The legislature has shown by its application of the same phrase to each type of credit insurance that it makes no distinction between the amount that may be allowed for credit disability insurance versus credit life insurance. If the legislature had intended that the two types of insurance be treated differently, certainly it would have used different language for each type.
Even if we decided that the statute and the regulation are unclear and that this Court must supply the meaning, should we allow the defendants to be charged with liability because they adhered to their understanding and the state agencies' understanding of the meaning of the terms involved? We would not allow a criminal defendant to be charged with a crime based on a vague statute, which a court could interpret in any fashion it pleased. Why are automobile dealerships and insurance companies afforded less protection than criminal defendants?

III. RELIANCE
Justice Butts has written an excellent opinion involving a similar issue. In Farmer v. Hypo Holdings, Inc., 675 So.2d 387 (Ala. 1996), he said:
"We have previously stated that because the legislature is presumed to be aware of how an administrative agency has interpreted a statute, the subsequent reenactment of the statute without material change is an indication that the legislature approves the agency's interpretation. Robinson v. City of Montgomery, 485 So.2d 695 (Ala.1986); Hamm v. Proctor, 281 Ala. 54, 198 So.2d 782 (1967); Jones v. Phillips, 279 Ala. 354, 185 So.2d 378 (1966)."
675 So.2d at 390. Justice Butts's opinion in Hypo Holdings changed the entire result of an earlier opinion in that case in response to an application for rehearing. This Court should not be above admitting its error in this case.
As evidenced by the affidavits of Floyd and Dyer and the memo in the record from C.S. Blackledge, the supervisor of the Bureau of Loans before Mr. Floyd, the Banking Department and the Insurance Department have consistently interpreted § 5-19-20(a) since 1981, at the latest. Since that time, this particular section of the Mini-Code has been amended twice (see Ala. Acts 1986, Act No. 86-304, and Ala. Acts 1987, Act No. 87-766). Neither of those amendments overruled the published administrative interpretations of that statute. Therefore, this case fits neatly into the category of cases involving an interpretation of a statute by administrative agencies. In this case, the Court would not be "blindly" following the interpretation of the statute, but it would be adhering to a reasonable interpretation for which the judges of this Court should not "substitute their personal assessment of the meaning of the regulation for the considered judgment of the agency." Allen M. Campbell Co., supra, 446 F.2d at 265. As the Fifth Circuit Court of Appeals wrote: "If the agency interpretation is merely one of several reasonable alternatives, it must stand even though it may not appear as reasonable as some other." 446 F.2d at 265.
In Spears v. Colonial Bank of Alabama, 514 So.2d 814 (Ala.1987), this Court addressed a claim that another automobile dealer and a bank had violated § 5-19-20 in the manner in which they calculated the premiums for credit life insurance. The automobile dealer received 50% of the premium as a commission. The plaintiff in that case claimed that the practice resulted in an excessive premium. There was no viable claim. This Court explained why:
"The Alabama State Banking Department has promulgated rules and regulations establishing and authorizing the maximum *172 single premium rates for credit life insurance and credit disability insurance. The superintendent of banks of the state banking department is empowered to make such rules and regulations as are reasonably necessary for the execution and enforcement of the provisions of the Mini-Code, pursuant to § 5-19-21. All parties agree that the premiums charged to the plaintiffs for the various insurance coverages were within the lawful maximum rates established by the state banking department."
514 So.2d at 816-17.

III.A. WHAT WAS RELIED UPON?
Let us examine the documents from the responsible agencies to determine just what the agencies say the statute and the regulation mean. Mr. Robert Floyd, supervisor of the Bureau of Loans for the Banking Department, provided an affidavit that stated the following: That he is the designated deputy administrator responsible for the enforcement of § 5-19-1 et seq. (the "Mini-Code"); that as of the date of the transaction between the McCullars and Regency Chevrolet-Olds, the rules and regulations used by Mr. Floyd in his affidavit were the applicable rules and regulations adopted by the superintendent of banks for the enforcement of the Mini-Code; that the regulations themselves state that they became effective December 1, 1983; and that these rules state that the rules, regulations, and orders of the Alabama State Insurance Department apply to the issuance of all credit life insurance in Alabama.
According to Mr. Floyd, the consistent interpretation of § 5-19-20(a) and the phrase "amount ... of credit" has been, and was at the time of the transaction in question, the "total of payments" on an add-on/precomputed interest credit transaction. In stating this conclusion, Mr. Floyd also referred in his affidavit to an October 31, 1981, memorandum by C.S. Blackledge, the previous supervisor of the Bureau of Loans. He added that this interpretation is consistent with the State of Alabama Insurance Regulation No. 28. He said,
"Thus, it is and remains my official opinion, as well as that of the State Banking Department, that the premium for decreasing term credit life insurance may be written for the total of payments due on add-on/pre-computed interest credit sales transactions in Alabama, and the premium for such insurances is not required to be calculated upon the amount financed or principal amount of a credit sales transaction."
Mr. Floyd examined the face of the sales contract signed by Alan McCullar, the ex-husband of Cindy McCullar, and determined the following: That it is a retail installment sales contract for the purchase of a 1990 Oldsmobile Cierra at a cash price of $14,248.19, reduced by a down-payment of $1,500, leaving an unpaid balance of $12,748.19; that Alan McCullar elected to purchase credit life insurance, for which the premium was $1,037.10 (the figure was actually $1,037.19); that the credit disability insurance premium was $1,306.75 and that after adding these premiums, the amount of credit provided was $15,105.54 according to the sales contract and that after adding the precomputed interest, the total balance due was $20,742.00. Mr. Floyd stated that the credit life insurance premium was calculated based on the total of payments in the amount of $20,742.00. Each of the 60 monthly installment payments was $345.70. Mr. Floyd said:
"The credit life premium was properly itemized and included in the total amount financed. Under these facts, it is my opinion as the Supervisor, Bureau of Loans, for the Alabama Department of Banking, that there was no violation of Insurance Regulation 28, or Section 5-19-20, Code of Alabama (Supp.1992). The credit insurance premium of $1,037.19 was properly calculated based upon the credit life insurance rates in effect in May, 1990, was calculated correctly on the total of payments due on such add-on/pre-computed interest credit sales transaction of $20,742.00, and does not violate the Insurance Regulations, or the Mini-Code's prohibition against the sale of insurance in excess of `the approximate amount and term of the credit.'"
Mr. Dyer, consulting actuary for the State of Alabama Department of Insurance, stated in his affidavit the following: That he is a *173 person charged with interpreting and applying the insurance statutes and regulations as they relate to the actuarial computations; that regarding § 5-19-20(a): "The State Banking Department has consistently interpreted and enforced the phrase `amount ... of credit' to be the `total of payments' on an add-on/precomputed interest credit transaction [and that the] State Banking Department's interpretation of Section 5-19-20(a), Code of Alabama (Supp.1992), of the Mini-Code is also consistent with the State Department of Insurance Regulation No. 28, Section III(A) and (B)"; that "It is and remains my official opinion, as well as that of the State Insurance Department, that the premium for decreasing term credit life insurance may be written for the total of payments due on add-on/pre-computed interest credit sales transactions in Alabama, and the premium for such insurances is not required to be calculated upon the amount financed or principal amount of a credit sales transaction." He examined the sales contract and saw the disclosures that Mr. Floyd saw. Mr. Dyer said the calculation of the premiums was not a violation of insurance regulations or the Mini-Code's "prohibition against the sale of insurance in excess of `the approximate amount and term of the credit.'"
The C.S. Blackledge memorandum referred to two different conceptsthe amount of insurance initially written and the changing balance as monthly payments are paid. Alan McCullar was sold what is called "decreasing term" credit life insurance; it is called this because the amount of coverage decreased each month by the amount of the monthly payment. Mr. Blackledge's memo helps to clarify the second clause of Section III of Insurance Regulation No. 28, which prohibits the sale of credit life insurance that does not decrease as the periodic payments are made. Therefore, Mr. Blackledge's memo reads, "The total of payments is insured on precomputed contracts with [a rate] based on insuring gross balances that decline by the amount of even periodic or monthly installments." (Emphasis added.) Section III of Regulation 28, upon which Mr. Blackledge was commenting, states: "The amount of group credit life insurance written under one or more certificates ... shall not exceed the original face amount of the specific contracts of indebtedness ...; ... when the indebtedness is repayable in substantially equal installments the amount of insurance shall never exceed the approximate unpaid balance of the loan." (Emphasis added.)[1] The first part of the regulation applies to the amount of insurance initially written. The second clause prohibits the continuation of the amount of insurance at the original face amount, "where the indebtedness is repayable in substantially equal installments." The Blackledge memorandum also distinguishes between an "add-on/precomputed note" and a "simple interest bearing note." For the "add-on/precomputed note," the memorandum confirms that the words of Regulation 28, "approximate unpaid balance of the loan," refer to the "gross balances that decline by the amount of even periodic or monthly installments," i.e., the "total of payments" method of calculation. As for the "simple interest bearing note," the memorandum states that the unpaid balance is "the original principal amount less principal payments applied in accordance with the terms of the note, plus interest accrued on the outstanding balance since date of last payment; it is not the total of the remaining installments." For "add-on/precomputed" notes, one can use the "total of payments" method; for simple interest loans, one cannot. The McCullars' note was an "add-on/precomputed" interest note.
*174 Both the Insurance Department and the Banking Department have written amicus curiae briefs in this appeal. The Insurance Department has confirmed that Mr. Dyer and Mr. Floyd's interpretation of § 5-19-20 and Regulation No. 28 is an accurate statement of the interpretation consistently held by the State of Alabama Department of Insurance. The Banking Department's brief agrees with that of the Insurance Department. The following is a representative statement from the Banking Department:
"The Department has consistently interpreted the phrase `amount and term of credit' to be the total of payments in the context of a add on/precomputed interest credit transaction. Decreasing term total of payments coverage involves the amount of coverage decreasing each month by the amount of the installment payment, whether or not it is paid. Any excess must be paid to the beneficiary or estate if there is a claim. Lesser coverage, such as insurance which covers only the amount financed, poses a greater risk of leaving some indebtedness to pay. The Department's position regarding this determination is consistent with that in many other states and the Uniform Consumer Credit Code, which was the model legislation upon which the Mini-Code is based.... The state departments that regulate this activity have consistently interpreted the controlling law and regulations so as to permit and authorize that the amount of credit life insurance and the credit life premiums be calculated based upon the `total of payments' in the context of a add on/precomputed credit transaction. This determination is technical in nature."
According to the amicus curiae brief of the Consumer Credit Insurance Association, the National Association of Insurance Commissioners (NAIC) has drafted model legislation regarding credit life insurance. Its membership consists of the insurance regulatory officials of all 50 states, the District of Columbia, and four territories. It provides a clearinghouse for the exchange of information and for assisting these officials in the performance of their duties. Its December 9, 1985, "Report of the Credit Insurance (E) Task Force of the NAIC," printed in 1985 Proceedings of the NAIC, Vol. I, at 804, described the position that it has consistently held:
"The NAIC Model Bill ... provides that the amount of credit life insurance coverage may not exceed (at any time during the course of an installment loan) the `indebtedness,' which is defined as the total amount remaining to be paid on a loan. In closed-end debts, the scheduled amount of coverage, therefore, exceeds the net amount due at death in any month by an amount equal to the refund of unearned finance charge then due."
Therefore, this organization also holds to the interpretation that the "total of payments" method is appropriate and is used widely.
The Mini-Code itself helps us in defining the words "the approximate amount and term of the credit." In § 5-19-20(d), the same section addressed by the plurality opinion, the legislature used very clear wording when referring to the "principal." That section reads:
"A creditor may not contract for or receive a separate charge for insurance against loss of or damage to property or against liability for property damage or personal injuries unless the original amount financed or original principal exclusive of the charges for insurance is $300.00 or more."
(Emphasis added.) The legislature knew how to make itself clear when it was referring to principal only, when it used the terms "original amount financed" and "original principal." Those terms are used elsewhere in the Mini-Code, e.g., at §§ 5-19-3 and 5-19-10. "[W]here there is a `material alteration in the language used in the different clauses, it is to be inferred' that the alterations were not inadvertent." House v. Cullman County, 593 So.2d 69, 75 (Ala.1992), quoting Lehman, Durr & Co. v. Robinson, 59 Ala. 219, 235 (1877). The terms "original amount financed" and "original principal" are clear as to what they describe. If the legislature had intended to refer to the "principal" only, then it would have used the clear wording it used elsewhere. "A text without a context is a pretext" is an excellent rule to *175 follow when interpreting terms and phrases in documents. The context of § 5-19-20 and the entire Mini-Code show that the words "the approximate amount and term of the credit" do not mean the principal only.

III.B. WHAT SHOULD NOT BE RELIED UPON
The only evidence supplied by Cindy McCullar to contradict the affidavits of Floyd and Dyer was the affidavit of Robert Harrison, a vice-president of Central Bank of the South (now Compass Bank). He is licensed to sell credit life and credit disability insurance, but he has no association with the State of Alabama Banking and Insurance Departments and has no responsibility for interpreting the statutes and regulations. He is essentially a private citizen giving his opinion on the law and regulations of the State of Alabama. The plurality opinion cites his opinion as somehow authoritative in this matter. Mr. Harrison said that, under the regulation, the amount of insurance could "never exceed the approximate unpaid balance of the loan," when the repayment is made in "substantially equal installments." Mr. Harrison defines "the approximate unpaid balance of the loan" as principal only. His definition is different from that of the state agencies charged with interpreting the law and the regulations. Why should a private citizen's opinion have any bearing on this matter at all? This Court has relied upon the interpretation of a self-proclaimed "expert," an "expert" whose interpretation contradicts the interpretation of the agencies charged with interpreting state law and the actual drafting of the regulations that apply that state law.
Even though I am not an expert in finance, I know what can happen if I default on an installment loan related to the purchase of an automobile. The creditor usually can accelerate the payments and require that I pay the entire balance of the loan, including principal, interest earned, and any other charges. It does not matter that the agreement with the lender allows me another three years to pay the note. What if I die the day after the creditor notifies me that it has accelerated my payments because I am in default? The total due and owing to that creditor is the principal and earned interest and any other charges necessary. How much will that amount be? It is impossible to know at the time I purchase the car and borrow the money. What amount should the finance company and the dealership say is the amount of credit life insurance needed? According to the plurality opinion, any amount above principal is fraudulent. Without credit life insurance that covers the entire "total of payments," the beneficiaries of my estate could face the loss of the car if they are unable to make the payment. I would be underinsured. Mr. Harrison said that "[a]t no point would the unpaid balance on the loan exceed $15,108.54." If Alan McCullar had died while in default upon the first month's payment, he would owe interest on that payment plus the entire principal of $15,108.54. See the sales contract, "Additional Terms and Conditions," specifically that portion under the heading "Default," which states that in the event McCullar defaults the creditor can demand immediate payment of "the entire balance of the amount due under the contract, including interest and other charges, plus any other debt" McCullar had with the creditor. "Default" in the sales contract is defined as failing to make one installment payment when due. Mr. Harrison's statement is therefore incorrect.

IV. THE PRECEDENT FOR DEFERRING TO STATE AGENCIES
I must agree with this statement in the defendants' brief on application for rehearing:
"These businesses [those offering credit life insurance] have been `whipsawed' by coordinate branches of state government, having been advised for years by the Executive Branch that credit life insurance could be based on the `total of payments' with regard to precomputed interest loans, and now being told by the Judicial Branch that their reliance was misplaced and that their transactions are illegal."
The Insurance Department has interpreted the "phrase `amount ... of credit' to mean the `total of payments' on an `add-on/precomputed *176 interest' credit transaction." (Plurality opinion, 687 So.2d 172.) This Court, in the past, has recognized that the Mini-Code provides for and permits add-on/precomputed interest loans and installment contracts. See Centennial Assocs., Ltd. v. Clark, 384 So.2d 616, 617 (Ala.1980). Why do we now suddenly change that position, with no explanation?
The plurality opinion recites the law that states that "[t]he interpretation placed on a statute by the executive or administrative agency charged with its enforcement is given great weight and deference by a reviewing court." 687 So.2d at 163. This should be particularly true where, as here, "the long-standing interpretation has controlled how the public has conducted its business." City of Birmingham v. AmSouth Bank, N.A., 591 So.2d 473, 477 (Ala.1991). The rationale underlying this deference to administrative agencies is that the agencies, not the courts, possess "specialized competence in the field of operation entrusted to [them] by the legislature." Hamrick v. Alabama Alcoholic Beverage Control Bd., 628 So.2d 632, 633 (Ala.Civ.App.1993), quoting Alabama Dep't of Public Health v. Perkins, 469 So.2d 651, 652-53 (Ala.Civ.App.1985). Furthermore, it is undisputed that the defendants, as well as the lending and credit insurance industries in general, have justifiably relied on this long-standing administrative interpretation for decades. Stallworth v. Hicks, 434 So.2d 229, 230-31 (Ala.1983). However, the plurality opinion gives no weight to the interpretation of the statute by the administrative agencies charged with its administration and enforcement. Instead, the plurality opinion seems to give more weight to the testimony of Robert Harrison, a Compass Bank vice-president.
The Alabama legislature has amended the Alabama Mini-Code on several occasions since the Banking Department and the Department of Insurance initially issued their interpretations of § 5-19-20(a). At no time has the legislature altered those interpretations. These amendments, "without change, of a statute which has been given a uniform construction by the administrative department `may be treated as a legislative approval of the departmental construction of the statute, quite as persuasive as the re-enactment of a statute, which has been judicially construed.'" State v. Southern Elec. Generating Co., 274 Ala. 668, 670, 151 So.2d 216, 217 (1963), quoting State v. Birmingham Rail & Locomotive Co., 259 Ala. 443, 66 So.2d 884 (1953). The legislature is deemed to have given approval to the long-standing administrative interpretation of a statute. Therefore, this Court should not "usurp the role of the legislature ... and amend statutes under the guise of construction." Honeycutt v. Employees' Retirement System of Alabama, 431 So.2d 961, 964 (Ala.1983). This Court has stated:
"[T]he generally accepted theory is that rules, regulations and general orders of administrative authorities pursuant to the powers delegated to them have the force and effect of laws, when they are of state-wide or national application, and so set up as that information of their nature and effect is readily available, or has become a part of common knowledge."
State v. Friedkin, 244 Ala. 494, 497, 14 So.2d 363, 365 (1943). That quote perfectly describes the history of the law of Alabama with respect to credit life insurance.
In interpreting the Insurance Regulations, this Court should look to the intent of the drafters of the regulations. Personnel Board of Jefferson County v. Bailey, 475 So.2d 863 (Ala.Civ.App.1985) (substantial deference should be given to an agency's interpretation of its own rules and regulations); see also Parker v. Bowen, 788 F.2d 1512, on remand, 793 F.2d 1177, on remand, Hand v. Bowen, 793 F.2d 275 (11th Cir.1986) (an agency's interpretation of its own regulations is entitled to deference and is controlling unless it is plainly erroneous or inconsistent with the language and purposes of the regulation).
Furthermore, "a court, whenever possible, should avoid a construction of a regulation that would raise doubt as to the regulation's validity or hinder its ability to make its statutory authority operative." Newsome v. Trans Int'l Airlines, 492 So.2d 592, 596 *177 (Ala.), cert. denied, 479 U.S. 950, 107 S.Ct. 436, 93 L.Ed.2d 386 (1986).
And, finally:
"The language used in an administrative regulation should be given its natural, plain, ordinary, and commonly understood meaning, just as language in a statute. In addition, however, one should construe such language by looking at the entire regulation, rather than at just an isolated clause or paragraph."
Alabama Medicaid Agency v. Beverly Enterprises, 521 So.2d 1329, 1332 (Ala.Civ.App. 1987) (citation omitted) (emphasis added); see also Alabama Precast Products, Inc. v. State, Department of Revenue, 332 So.2d 160 (Ala.Civ.App.), cert. denied, 332 So.2d 164 (Ala.1976) (courts, in construing regulations, must look to the plain meaning of the provisions).
The drafter of the Department of Insurance Regulations is the Department of Insurance. Therefore, if this Court seeks to find the interpretation of a portion of Regulation No. 28, it should look to the drafter of the regulationthe Department of Insurance. Bailey, 475 So.2d 863.
The Department of Insurance made it simple and clear for this Court when it filed an amicus brief stating its interpretation of Regulation No. 28. The regulation allows use of the "total of payments" method for calculating the amount of insurance needed. The Department of Insurance wrote Regulation No. 28; therefore, its interpretation of that regulation is controlling, unless it is plainly erroneous or inconsistent with the language and purposes of the regulation. Bowen, 788 F.2d 1512. Mr. Robert Harrison did not draft and promulgate Regulation No. 28. Therefore, I must ask why does the plurality adopt his view as to the intent and meaning of the regulation, when the Department of Insurance, the drafter of the regulation, has specifically told this Court its meaning?
Furthermore, if the authority of the Insurance Department's interpretation was not enough, the American Council of Life Insurance ("American Council"), the Consumer Credit Insurance Association ("Consumer Credit"), and the Alabama State Banking Department ("Banking Department") all agree with and validate that interpretation. They all contend that the Alabama Code and Department of Insurance Regulations authorize creditors to base the amount of credit life insurance upon the amount of indebtedness, which includes principal and interest, the "total of payments." This Court has received amicus briefs from national and state governmental agencies and private organizations who are experts in the complex insurance industry. Nevertheless, the plurality disregards the positions of those expert groups and adopts the lay interpretation of Mr. Harrison.

IV.A. THE AMOUNT OF INSURANCE NEEDED
Who is at risk in the credit sale of an automobile? Both the seller and the buyer. The seller risks the possibility of default by the buyer. Perhaps the seller will have to repossess the car, and if the buyer is bankrupt then the seller still probably will not be able to cover the repossession expenses or the unmade payments. What if the buyer dies? Will his estate be able to cover all the car payments? If not, the seller loses because of the costs of repossession. If the seller believes the risk for these possible events is too great, then sales to people with higher credit risks will cease, or the interest rate will rise. Therefore, the seller can protect himself, but those people will not be able to purchase automobiles. For some, life without an automobile means no transportation to work and therefore no means of support. The car has become an essential item for many people. Credit life insurance is the only way some people can afford to purchase a car.
Apparently, Alan McCullar's sense of security was enhanced by choosing to pay the extra expense for premiums for the credit life and credit disability insurance. Not only is the seller's risk lowered by credit life insurance, but so is the buyer's risk. If the seller felt that only the principal was covered by the credit life insurance, there would be a need to raise the interest rate charged for loans to purchase the seller's cars. The risk factor would have increased. Therefore, the *178 interest rate would also have to increase. Are there not other costs besides interest that the seller has to take into account? If a buyer dies, interest accrues from the time of the last payment. How much will that be? Not much, but no one knows at the point of sale exactly how much will accumulate. No one knows when or if a buyer will die. No one knows for sure what other charges may accrue and be necessary to cover a loss if someone dies, e.g., charges related to default.
Therefore, in order for sellers to ensure that their risk is lowered to the optimal point for serving their customers, they want credit life insurance that covers the entire "total of payments" owed. In order for buyers to have the greatest sense of security for themselves and their heirs (and in some cases for them to even afford to buy a car), they purchase credit life insurance that covers the "total of payments" owed. The risk for both the buyer and the seller is lowered to its optimal point. It is a contractual agreement that benefits both parties. It is not fraud.
Even McCullar would have to admit that there will be times when a payoff of the principal alone will not cover the entire debt of the insured. When an insured dies after a monthly payment has been made, there is at least an amount of earned interest from the date the last payment was applied until the date the loan is paid off. It may be a small amount, but it is an amount above the principal. The truth is that that situation will be the usual situation. In order for insurers to fully cover an insured, what amount do they use? The principal plus a little extra for the deficiency that may develop? How much extra? Even a penny over the principal amount would place the insurer in violation of § 5-19-20 as it is interpreted by the plurality of this Court. The plurality opinion would certainly place these insurers in a catch-22. Insuring only the principal amount would almost always mean underinsuring the debtor, and thereby subjecting the insurer to potential loss. And, if the insurer tries to cover any amount above the principal, it violates § 5-19-20 and is thereby subject to liability.
Also, it is important to understand the workings of credit disability insurance. Part of Cindy McCullar's claim involves credit disability insurance. If the buyer becomes disabled and unable to make payments, the credit disability insurance does not pay off the balance. It merely begins to make the payments for the buyer during the disability. If the credit disability insurance covered only the principal, then each month the buyer would have to make up the shortfall between the principal and the interest. This is a result that the buyer would not have anticipated when purchasing credit disability insurance. The buyer wants to have the total payment covered by the insurance. Anything less and the buyer can sue for being underinsured. Although the plurality states that its decision will have no effect on credit disability insurance, that statement does not resolve the issue for those offering credit disability insurance in future cases in which a court is asked to interpret the statute. Because § 5-19-20(a) also applies to credit disability insurance, I do not see how defendants in cases involving credit disability insurance could avoid the application of this same restrictive interpretation of the statute. It places the insurer and the retailer that offers credit disability insurance between a rock and a hard place.

IV.B. THERE IS NO LOSS
If, in fact, the seller overestimated the need for the insurance, then, in the event of death, the insurance policy clearly provides for payment of the excess to the secondary beneficiary named by the buyer/insured (the primary beneficiary being the finance company). If there is no secondary beneficiary, then the excess is paid to the buyer/insured's estate. The credit life insurance policy issued by Universal Underwriters, and to which the McCullars agreed to be bound, states: "Claim payments are made to the Creditor named in the borrower's group certificate schedule to pay off or reduce the debt. If claim payments are more than the balance of the debt, the difference will be paid to the Second Beneficiary, if any. Otherwise, payment will be made to the Insured's estate."
In such an arrangement, the buyer loses nothing. If Cindy McCullar disagrees with *179 the accounting method used to calculate the amount of insurance needed, then that is all we have herea disagreement over an accounting method. Regency, as the primary beneficiary, wanted the best coverage. However, there are other alternatives. Alan McCullar could have obtained a loan from a bank and could have purchased credit insurance through the bank if he thought he could get a better deal. He could have chosen not to purchase the credit life insurance at all. His ex-wife may not come into court after she has defaulted on the sales contract and charge Regency and Universal with fraud. This Court should not say that a disagreement over two legitimate methods of accounting means that there exists a genuine issue of material fact regarding a fraud claim.
At worst, credit life insurance is expensive. But even that is understandable in light of the fact that it has minimal underwriting requirements. A person applying for credit life insurance obtains it automatically at the time of sale. There is no need for a physical examination or a lengthy application process, and even the overweight person who smokes heavily and has a family history of cancer and heart disease will be approved for the insurance. Alabama Department of Insurance Regulations and the law of Alabama cap the premium even for the most unfit applicant at $1.60 per $100 coverage per annum. Expensiveness is not the determinative factor when one is checking for fraud. This is a free country. If the McCullars thought they were paying too much for this particular insurance, they were under no compulsion to purchase a car at Regency Chevrolet-Olds. Even after they chose to purchase a car from Regency, they could have obtained credit life insurance elsewhere, and perhaps at a lower premium.

IV.C. CALCULATING THE "TOTAL OF PAYMENTS"
If Regency and Universal used the "total of payments" method to sell credit life insurance and that method was acceptable to the state agencies charged with regulating them, then Cindy McCullar should not be allowed to challenge that method after the fact any more than the buyer of a Cadillac should be allowed to claim he or she was defrauded because they could have purchased a Volkswagen at a much lower pricethat all they needed was some transportation, and not all the fancy items that came with the Cadillac. The buyer can perhaps claim to have been overcharged; the buyer should not be allowed to allege fraud simply because the Cadillac was more expensive. The "total of payments" principle reduces the risk of both the buyer and the seller to the lowest point possible.
If the buyer falls behind in payments and then dies, insurance that covers only the principal will be insufficient to pay off the full indebtedness. The problem of having too little insurance is actually more serious for both parties than that of having too much. There exists precedent for Universal Underwriters to be sued for supplying too little insurance. In Applin v. Consumers Life Insurance Co. of North Carolina, 623 So.2d 1094 (Ala.1993), overruled by Boswell v. Liberty National Life Ins. Co., 643 So.2d 580, 582 (Ala.1994), this Court upheld the dismissal of an action for failure to state a claim. In that case, there was no damage because the plaintiff Applin had never filed a claim; further, the fraud allegation was not pleaded with particularity. Boswell, 643 So.2d at 582, overruled Applin on one issue. Boswell held that damage can occur to an insured even if the insured does not file a claim on the policy. In Applin, the plaintiff alleged that "he paid for, but did not receive, an amount of coverage equal to the balance due on the note." Applin, 623 So.2d at 1098. Interestingly, in that opinion this Court defined the term "amount financed." This Court said, "`amount financed,' however, ordinarily includes the total amount payable in principal and interest over the term of the loan." Id. at 1098.
If Alan McCullar had agreed to a simple interest loan, then Cindy McCullar may have a valid claim because the rule under Regulation No. 28 is different for the simple interest loan. The amicus curiae brief filed by the Automobile Association of Alabama gives a good discussion of the difference between the simple interest loan and the add-on/precomputed *180 interest loan. In a precomputed interest transaction, the debtor agrees to pay the principal and a fixed amount of interest, but in a simple interest loan the debtor agrees to pay the principal and a fixed rate of interest. The difference between the use of the terms "rate" for simple interest loans and "amount" for precomputed interest loans is great. In a simple interest loan, the interest is calculated at the agreed-upon rate on the outstanding balance every time a payment is due. As the principal balance of the obligation is reduced, the dollar amount of interest likewise declines. See Ala.Code 1975, § 5-19-3(f)(1). In the simple interest loan, most of the interest is paid by the borrower in the earlier payments.
In an add-on/precomputed interest type loan, the total amount of interest to which the creditor would be entitled over the life of the loan is calculated at the time the loan is made and is then added to the principal balance. See Ala.Code 1975, § 5-19-3(b). The add-on/precomputed interest loan makes recordkeeping simpler because all the interest due is calculated at the beginning of the transaction and then spread equally over the life of the loan. There is no need to calculate interest every time a payment is scheduled or actually made. The amount of insurance does not decline with each payment. It declines by the amount of the scheduled payment each month whether a payment is made or not. If the buyer has not paid some of the monthly payments, then the excess coverage helps the buyer pay that. If the buyer pays the obligation as and when the payments are due, a surplus in insurance coverage may result if the buyer dies during the term of the credit. In this instance, the insurance proceeds over and above what is required to pay off the debt in full are remitted either to a beneficiary designated by the consumer or to the estate. Universal Underwriters was contractually obligated to pay the full amount of the policy if Alan McCullar had died the day after the credit sale occurred. That is, Universal would have paid to the creditor the full amount of the installment contract plus earned interest, and the excess insurance would be paid to the person designated by Alan McCullar as the secondary beneficiary under the policy.
In addition, as pointed out in the amicus brief filed by the American Council of Life Insurance, until recently lenders did not have the capability to make the daily calculations necessary to monitor the actual payoff amount of a loan. Today, only the largest and most sophisticated lenders have the computer capability to calculate credit insurance premiums on the monthly outstanding balance of all of their loan accounts. Such companies can know at any given time what amount is necessary to pay off the loan, and they can charge a premium that changes monthly based on whether and when the monthly payment was made. Community banks, automobile dealers, and other small financial institutions do not have this capability. In order to provide the most safety to buyers, who do not want their families burdened with an automobile debt after their loved one has died, the insurer insures for the "total of payments." That is the best, but even then not a foolproof, way to ensure there is no shortfall. Anything less would not be serving the buyer/debtor. Even in the case of "total of payments" type insurance, the insurance may not be enough to pay off the debt in full. In the event the consumer is delinquent in payments, there is a risk of underinsurance. The amount of insurance declines with each scheduled payment, whether or not a payment is made. When a consumer is in serious arrears at the time of his death, the insurance may not pay the debt in full. By saying that the "approximate unpaid balance of the loan" excludes interest, the plurality opinion has ensured that the insurance will never be enough to pay off an add-on/precomputed interest debt, even if the customer is current on all payments. The key difference between a simple interest loan and an add-on/precomputed interest loan is that the interest in the latter is fixed. In the add-on/precomputed interest loan, the insured agrees to pay the total of payments, which includes interest over the life of the loan. The plurality opinion seems to have blurred the distinction between these two types of loans.
This distinction between "simple" interest loans and "add-on/precomputed" interest loans has been accepted as part of Alabama *181 law for a long time. Section 5-19-3(b) states:
"The maximum finance charge under subsection (a) of this section shall be determined by computing the maximum rates authorized ... on the original principal amount of the loan or original amount financed for the full term of the contract without regard to scheduled payments and the maximum finance charge so determined, or any lesser amount, may be added to the original amount financed."
Section 5-19-3(f) indicates that the simple interest contract does not involve "adding on" to the original principal at the inception of the loan:
"In lieu of the finance charges set forth in subsection (a), ... a creditor may contract for and receive finance charges on any loan of money at the rate of not more than one and one-half percent per month as follows:
"(1) Charges shall be computed on unpaid balances of the principal amount outstanding from time to time, for the actual time outstanding. Each payment shall be applied first to accumulated charges and the remainder of the payment applied to the unpaid principal balance, except that if the amount of the payment is insufficient to pay the accumulated charges, unpaid charges continue to accumulate to be paid from the proceeds of subsequent payments and are not added to the principal balance."
In contrast, the finance charge in an "add-on/precomputed" contract is "added on" at the beginning of the loan, not recomputed every payment. This concept was accepted by this very Court as early as 1980. In Centennial Associates, Ltd. v. Clark, 384 So.2d 616 (Ala.1980), this Court said,
"Additionally `maximum finance charges' in the Mini-Code are expressed in `add-on' terminology (i.e., these charges ... may be aggregated for the term of the loan, and added to the principal and then divided by the number of installment payments) as distinguished from the `simple interest' characterization, where an interest percentage is computed on the principal balance from time to time outstanding, for the period of time that the debtor has the use of the principal amount between installment payments."
384 So.2d at 617.
Therefore, McCullar has made no showing that the "amount" of credit life insurance Regency issued was excessive. The amount insured was exactly what was needed for this type of loan. McCullar has failed to show a misrepresentation of any fact or that she relied on any misrepresentation to cause her damage of any kind. At best, she has shown that she agreed to credit life insurance that, in the event of death, would have paid off the loan on her car and then paid her secondary beneficiary any excess that may have existed after such payment. The loan contract did not conceal the amount that the credit life insurance covered. It did not conceal the amount of her premium. It did not underinsure her. And it did not overinsure her. Thus, she simply has no claim.

V. OTHER STATES
The overwhelming majority of the states of this country (at least 42) allow for the "total of payments" method of calculating the amount of insurance needed.[2] See Appendix, LIST OF STATES' POSITIONS ON CREDIT LIFE INSURANCE RATES.
Not only have most other states affirmed the legitimacy of the "total of payments" method of calculating the amount of credit life insurance needed, so has the Uniform Consumer Credit Code (UCCC), the Code upon which much of the Alabama Mini-Code was based. UCCC § 1.301(33) states: "`Precomputed consumer credit transaction' means a consumer credit transaction ... in which the debt is a sum comprising the amount financed and the amount of the finance charge computed in advance." Uniform Consumer Credit Code, 7A U.L.A. 48 (Supp.1994). UCCC § 4.202(1)(a) states: "[I]n the case of consumer credit insurance *182 providing life coverage, the amount of insurance may not initially exceed the debt and, if the debt is payable in instalments, may not exceed at any time the greater of the scheduled or actual amount of the debt...." Uniform Consumer Credit Code, 7A U.L.A. 151 (Supp.1994).
I have also searched through the opinions of the courts throughout the entire country and have failed to find any court that construes the activity alleged in this complaint as fraud. Those cases I have found that come closest to involving fraud in the sale of credit life insurance are cases dealing with a purchaser's being underinsured, i.e., cases in which the insurance company provided coverage insufficient to cover the purchaser's debt. See Ex parte Serra Chevrolet, Inc., 674 So.2d 522 (Ala.1995); Barnes v. Holliday, [Ms. 09 26 95, June 6, 1990], 1990 WL 269884 (Conn.Super.1990) (unpublished); Pocatello Railroad Employees Federal Credit Union v. Galloway, 117 Idaho 739, 791 P.2d 1318 (Idaho App.1990); Marshall v. Citicorp Mortgage Inc., 601 So.2d 669 (La.App.1992); Gulfco Finance Co. v. King, 542 So.2d 801 (La.App. 1989), judgment vacated, 552 So.2d 1199 (La. 1989); Monroe Medical Clinic, Inc. v. Hospital Corp. of America, 622 So.2d 760 (La.App. 1993), cert. denied, 629 So.2d 1135 (La.1993); Bank of New Orleans & Trust Co. v. Phillips, 415 So.2d 973 (La.App.1982); Johnson v. Great Heritage Life Insurance Co., 490 S.W.2d 686 (Mo.App.1973); Carr v. Charter National Life Insurance Co., 22 Ohio St.3d 11, 488 N.E.2d 199 (1986); Hoovestol v. Security State Bank of New Salem, 479 N.W.2d 854 (N.D.1992); Knox v. Finance America Corp., [Ms. No. C.A. 931, June 7, 1990], 1990 WL 74403 (Tenn.App.1990) (unpublished); O.R. Mitchell Motors, Inc. v. Joe Marotta & Sons, Inc., 358 S.W.2d 741 (Tex.Civ.App. 1962). Of course, these cases present an issue that is entirely opposite to the issue involved in McCullar's claim that Universal Underwriters overinsured her. If Regency and Universal had not insured the McCullars for the "total of payments" on the car loan, then the loan contract would have had to carry a disclaimer to the effect that the credit life insurance being purchased may not be sufficient to pay off the loan on the car in the event of death of the insured. And even then, my research indicates, they could still be sued for underinsuring the purchaser.
Construing the statute in the light most favorable to the plaintiff, I conclude that the Alabama statute at issue§ 5-19-20may be considered ambiguous. The Alabama Trial Lawyers Association in its amicus argument before this Court even admitted that there was ambiguity in the statute.[3]

VI. THE IMPORTANCE OF NOTICE
Everything said thus far demonstrates one very important principle. That principle, *183 recognized in criminal cases and civil damages cases, is the following: "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose." BMW of North America v. Gore, ___ U.S. ___, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). In footnote 19 of Gore, the United States Supreme Court quoted Bordenkircher v. Hayes, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978): "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort...." This statement was made in the context of a criminal defendant's exercising his legal rights without fear of retaliation. The principle, however, is the same. Universal Underwriters and Regency Chevrolet-Olds are not criminal defendants, but they are facing the potential of civil punishment for actions they understood to be legitimate and legal. They understood their actions to be legal, based on the Alabama statute, the Alabama regulatory agencies, and the laws and practices of a majority of the states of this country.

VII. THE DANGEROUS PRECEDENT
Before the release of the first opinion in this case on September 29, 1995, potentially huge lawsuits were already filed against companies that have conducted thousands of transactions that as of September 29, 1995, all members of the finance and insurance industries thought were perfectly legal. The opinion of this Court is made worse by the fact that the decision will not apply prospectively only, but retroactively. Therefore, the lawsuit floodgates have been opened wide. The potential damage to the Alabama economy is beyond estimate. A constitutional case might rise from this opinion over the implications attendant to exposing business to massive liability for actions taken in reliance on the regulations and statutory interpretations of state agencies.
This new construction of § 5-19-20(a)a complete departure from the long-standing administrative construction of this provision of the Mini-Codeshould be applied prospectively only. The result of retroactivity will be massive litigation and massive liabilityliability so great that it could destroy much of the consumer credit and insurance industry in Alabama. If this opinion is allowed retroactive application as to already-filed cases, then any consumer who has obtained a precomputed interest credit life insurance loanand there could be literally hundreds of thousands of potential litigantscould join a class action lawsuit and sue his or her consumer lender, retailer, and insurance company, despite those companies' strict compliance with every statute, rule, or policy governing these transactions for approximately 25 years. Such class actions have already been filed throughout the State of Alabama, and more will be filed after the release of today's opinion. The potential exposure of these consumer lenders, retailers, and insurance companiesevery bank, every thrift, every life insurer, every automobile or appliance dealer, every furniture storeis virtually limitless. Small lenders could be wiped out. Customers that have used such small lenders would have to turn to pawn brokers or possibly even underworld figures, rather than the licensed and regulated small lenders who have served these people for so long. These are precisely the predictable consequencesthe impairment of existing contractual and property rights entered in reasonable reliance on an established statutory constructionthat the doctrine of prospectivity is intended to prevent.
The principle of prospective application of judicial decisions was extended to judicial construction of statutes in Farrior v. New England Mortgage Security Co., 92 Ala. 176, 9 So. 532 (1891). Because the judicial construction of a statute effectively becomes part of the statute, the Court held that a change in statutory construction should affect existing contractual rights in the same manner as do statutory amendmentsby prospective application only. Farrior, 92 Ala. at 179-80, 9 So. at 532-33. In State v. Morrison Cafeterias Consol., Inc., 487 So.2d 898 (Ala.1985), this Court determined that the decision should act prospectively only, even with respect to the appellee:
"The determination of retroactive or prospective application of a decision overruling *184 a former decision is a matter of judicial discretion which must be exercised on a case by case basis. [Citations omitted.]
"As stated in Cooper v. Hawkins, 234 Ala. 636, 638, 176 So. 329, 331 (1937), `where parties have acted upon the law as clearly declared by judicial decision, they will be protected, although such decisions are thereafter overruled. Farrior v. New England Mortgage Security Co., 92 Ala. 176, 9 So. 532 [(1891)]....' In fairness to all, including the appellee, who had justifiably relied upon this Court's previous holding in Hamm v. Windham, 254 Ala. 356, 48 So.2d 310 (1950), that food withdrawn from inventory and consumed by employees is not subject to sales tax, we hold that our decision in the instant case shall be given prospective application only."
487 So.2d at 903 (emphasis added). This Court has, from the 1800's until today, repeatedly held that a statutory construction that departs from a previous construction should be applied prospectively only. See Burke v. State, 385 So.2d 648, 652 (Ala.1980). The rule of prospectivity has been applied without exception when rules governing contractual or property rights that have become vested in reliance upon a settled construction are later overturned.
The legislature itself has expressed its opinion on the matter of prospectivity. In findings expressed in 1994 Ala. Acts, Act No. 94-115, § 1, the legislature stated that changes in interpretations of the Mini-Code must be carefully considered because it "appl[ies] to substantially all consumer credit transactions in Alabama involving many millions of dollars ...," because the "public interest requires certainty in laws relating to consumer credit transactions," and because "uncertainty could result in a significant reduction in the amount of consumer credit available to Alabama residents and thereby have a detrimental effect upon Alabama residents and businesses." The legislature further said that "it is essential that ... [changes in the Mini-Code] ... be carefully considered, specifically stated, and prospective in application." 1994 Ala. Acts, No. 94-115, § 1(5).
All of the factors that have impelled prospective application of new rules, whether in Alabama or in other jurisdictions, are present here. The new rule in this case has not yet been applied to the litigants in this or in other cases. A long line of Alabama precedent favors prospective application in circumstances such as those here, when an entire industry has based its practices on an existing statutory interpretation, when vested contractual rights are pervasive, and when retroactive application will create staggering losses that, in equity, need not occur. The cases cited by the appellant as supporting retroactive application of a judicial decision refer only to cases where it appears "reasonably certain" that the administrative agency has erroneously interpreted the statute in question. Sand Mountain Bank v. Albertville National Bank, 442 So.2d 13 (Ala.1983); Penrod v. Lapere, 367 So.2d 1381 (Ala.1979) (latest administrative interpretation even agreed with this Court's holding); Boswell v. Abex Corp., 294 Ala. 334, 317 So.2d 317, 318 (1975); Britnell v. Alabama State Board of Education, 386 So.2d 1148, 1150 (Ala.Civ. App.1980); Director, Dep't of Ind. Rel. v. Winston County Comm'n, 468 So.2d 177, 181 (Ala.Civ.App.1985). It is not reasonably certain that such an erroneous interpretation is present in this case. As for the United States Supreme Court cases cited by McCullar, they do not support retroactive application of the new rule in this case. The United States Supreme Court's rules on this issue are the rules for that Court. They do not bind Alabama unless Alabama is deciding a federal question. Those cases do support the proposition that if the new rule is applied retroactively to some parties, it should be applied retroactively to all parties. James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991); Harper v. Virginia Dep't of Taxation, 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993). A careful reading of these two cases shows that prospectivity was not eliminated in every case heard by the United States Supreme Court.
What about other types of credit insurance? This ruling will affect credit accident and health insurance, involuntary unemployment *185 insurance, and credit property insurance. All these types of insurance call for the insurer to "step into the buyer's shoes" and take over the car payments if the buyer gets hurt in an accident, gets sick, or loses a job. Property insurance covers the property used as collateral for a loan. Often, the value of the property pledged exceeds the amount of the debt. If the property is destroyed or lost and the insurance covers only the principal amount of the loan obligation, then the insured is assured of a financial loss. Therefore, interpreting § 5-19-20's phrase "approximate amount ... of credit" as referring only to the principal ensures that purchasers of several types of insurance will not be receiving coverage of the entire amount needed.
Are there other indirect effects of this decision? The law must have predictability so that individuals and corporations may have "confidence in the law's reasonable certainty, stability, and consistency." Stallworth, supra, 434 So.2d at 230 (quoting Bibb v. Bibb, 79 Ala. 437, 444 (1885)). What does today's decision say to the people of Alabama? It says, "You can be liable for fraud no matter what you do in your business. It is irrelevant that you are utilizing an acceptable business practice, one that has been used for decades, one that has been used around the country, one that everyone else in your line of business has used. It may even be a practice that has been approved by the state agencies charged with administering the type of business you are involved in. None of that matters. You may still be liable for fraud." This is a frightening proposition. Beyond the effects of this one case on the credit life insurance industry, such a precedent as this destroys the people's ability to rely on any law, regulation, or branch of state government. The effects are insidious. Like termites eating away at the foundation and structure of a house, one never sees the effects of their work until it manifests in damage to the support and foundation of the house. This decision eats away at the house of justice of Alabama, the destruction being hidden from view until it manifests in bankrupt businesses, lost opportunities and jobs, and the lawless distrust bred by inconsistent and unpredictable decisions of those appointed by the people to guard the justice system. Then, everyone asks, "Why is there so little opportunity in Alabama? Why is there so much fraud? Why is there so much mistrust of the judicial system?" This case will help a limited number of fortunate lawyers get rich; it will not stop any fraud in the State of Alabama. It only allows for predatory attacks on legitimate businesses. Class actions are already forming across the state. The termites are swarming.

VIII. STATUTE OF LIMITATIONS
The McCullars entered into this loan contract on May 28, 1990. Cindy McCullar filed this action on May 7, 1993, after she had defaulted on the loan and surrendered the car to AmSouth Bank. When she entered into this agreement, she had all the facts she needed to discover fraud, if there was any. Hicks v. Globe Life & Accident Ins. Co., 584 So.2d 458, 463 (Ala.1991); Applin v. Consumers Life Insurance Co. of North Carolina, 623 So.2d 1094 (Ala.1993), overruled on other grounds by Boswell v. Liberty National Life Ins. Co., 643 So.2d 580, 582 (Ala. 1994). These cases support the defendants' claim that under the two-year statute of limitations of § 6-2-3 her claim was time-barred. I would also add that at the time Cindy McCullar surrendered the car to AmSouth Bank, she received a refund of the unearned premium for the credit life insurance in accordance with the refund provision of her credit life policy.

IX. FURTHER DISCOVERY
I agree with one portion of the plurality's opinion. There is no need for any further discovery in this case. The question of the legality and legitimacy of the "total of payments" method of computing the amount of credit life insurance was conclusively settled by the affidavits of Mr. Floyd and Mr. Dyer and the C.S. Blackledge memorandum. That was a legal question requiring no cross-examination. The policy of the Banking and Insurance Departments has been consistent since 1981 and before. A 1986 case involving the identical allegations was decided by Judge Cherner based upon the affidavit of Mr. Floyd. The plaintiff can show nothing, *186 and there is nothing that can be brought out upon cross-examination of Floyd and Dyer, that would assist the plaintiff's search for facts helpful to her case. The facts as alleged by the plaintiff are the facts assumed by Dyer and Floyd in preparing their affidavits. Their affidavits were not "fact" affidavits; they were statements of policy of the two departments that they represent. When asked how further discovery would change the interpretations of the statute and the regulation by the two state departments responsible, counsel for the plaintiff simply claimed that the agencies'"application of the law to the facts" was "ludicrous." There is no need to send this case back for further discovery. The trial judge properly entered a summary judgment for the defendant. We should affirm that summary judgment. Alternatively, and at a minimum, this Court should state that its interpretation of § 5-19-20 is prospective only and has no effect on any business that has been operating with the understanding that this practice was legitimate and in accordance with the rules and regulations of the state agencies charged with enforcing that statute. Therefore, I must concur with the plurality opinion in regard to McCullar's claim for further discovery, but I heartily dissent from the plurality opinion's holding as fraud the "total of payments" method of computing credit life insurance.

APPENDIX TO SPECIAL OPINION OF CHIEF JUSTICE HOOPER: LIST OF STATES' POSITIONS ON CREDIT LIFE INSURANCE RATES
In this list, the use of the word "disputed" indicates that there is a dispute between the defendants' brief and the Alabama Trial Lawyers Association's amicus curiae brief filed on behalf of the plaintiff. The dispute concerns what type of computation a particular state allows an insurance company to use to determine the amount of credit life insurance needed by a purchaser/debtor. That is, does it allow the "total of payments" method? This research takes into account the fact that the alleged misconduct in this case occurred in 1990. Therefore, the quotes from some states' statutes and regulations do not reflect the most current statutes for those states.

APPENDIX TO SPECIAL OPINION OF CHIEF JUSTICE HOOPER: LIST OF STATES' POSITIONS ON CREDIT LIFE INSURANCE RATESContinued
The following list is based on my research into that question as to each state.
ALASKADisputed. Alaska Code § 21.57.040(a) (current as of 1994) limits credit life insurance as follows: "The initial amount of credit life insurance may not exceed the total amount repayable under the contract of indebtedness and, if an indebtedness is repayable in substantially equal installments, the amount of insurance shall at no time exceed the scheduled or actual amount of unpaid indebtedness, whichever is greater...." Compare this subparagraph with subparagraph (b), and you see that total of payments is within the meaning of the "unpaid indebtedness."
"(b) The total amount of periodic indemnity payable by credit accident and health insurance in the event of disability, as defined in the policy, may not exceed the aggregate of the periodic scheduled unpaid installments of the indebtedness; and the amount of each periodic indemnity payment may not exceed the original indebtedness divided by the number of periodic installments."
Subparagraph (b) clearly refers to a "total of payments" method of calculation. This statute does not exclude the "total of payments" method of calculating the amount of insurance needed.
ARIZONADisputed. Arizona Code § 20-1605A. & B. (1961, amended in 1982, current as of 1995):
"The initial amount of credit insurance upon the life of a debtor in connection with any loan or credit transaction shall not exceed the total amount repayable under the contract of indebtedness. In cases where an indebtedness is repayable in substantially equal installments, the amount of insurance shall at no time exceed the scheduled or actual amount of unpaid indebtedness, whichever is greater."
As you read the different statutes and rules of the states, you will notice a striking resemblance, as in Arizona's case, to the language of Alabama Department of Insurance

*187 APPENDIX TO SPECIAL OPINION OF CHIEF JUSTICE HOOPER: LIST OF STATES' POSITIONS ON CREDIT LIFE INSURANCE RATESContinued
Regulation No. 28. Instead of the words used by Alabama, "approximate unpaid balance of the loan," Arizona uses the words "the scheduled or actual amount of unpaid indebtedness, whichever is greater." Most states that use this language allow for the "total of payments" method. Arizona Code § 20-1606 (1961, current as of 1995) states that credit disability insurance "shall exceed neither the aggregate of the periodic scheduled unpaid installments of the indebtedness" and that "[t]he amount of the periodic indemnity payment shall not exceed the original indebtedness divided by the number of periodic installments." Arizona Administrative Code R20-6-604 (current through Sept. 30, 1995) defines "outstanding indebtedness" as "the amount borrowed by the debtor plus any unearned interest or finance charge." R20-6-604.C.3. takes into account excess insurance: "Whenever the amount of insurance may exceed the unpaid indebtedness such excess shall be paid to a beneficiary, other than the creditor, named by the debtor, or to the debtor's estate." Arizona Administrative Code, R20-6-604.C.12., deals with the question whether the insured pays for a "net" or a "gross" coverage. Which is purchased is the insured's choice. Clearly, the "total of payments" method, which includes interest, is allowed. See Huskie v. Ames Brothers Motor & Supply Co., 139 Ariz. 396, 678 P.2d 977 (1984).
ARKANSASDisputed. Arkansas Code § 23-87-108(a) (current as of 1995) states: "The amount of credit life insurance shall not exceed the original amount of the indebtedness." (No reference is made to equal-installment type contracts.) Section 23-87-108 provides that credit disability insurance "shall not exceed the aggregate of the periodic scheduled installments of indebtedness and shall not exceed the original indebtedness divided by the number of periodic installments." Arkansas Regulation 12, paragraph 6, states that the insurer may request of the Insurance Commissioner a waiver if the insurer wants to charge a different rate of premium per $1,000. Arkansas does not prohibit the "total of payments" method.

APPENDIX TO SPECIAL OPINION OF CHIEF JUSTICE HOOPER: LIST OF STATES' POSITIONS ON CREDIT LIFE INSURANCE RATESContinued
One Arkansas case stated that the term "indebtedness" in Ark. Stats. §§ 66-3804(5), 66-3806(1) included not only the principal, but also all amounts payable by the borrower in connection with the loan, e.g., interest and the credit life insurance premium. Winkle v. Grand National Bank, 267 Ark. 123, 601 S.W.2d 559, cert. den., 449 U.S. 880, 101 S.Ct. 230, 66 L.Ed.2d 104 (1980); see also Poole v. Bates, 257 Ark. 764, 520 S.W.2d 273 (1975).
CALIFORNIAThe defense does not claim California uses "total of payments." However, California Administrative Code § 2248.7 states that that subsection is violated if the insurer "provides an amount of insurance less than the amount necessary to discharge the indebtedness, when it does not set forth clearly such information on the insured debtor's policy or certificate in bold print or in other prominent method." Obviously, the concern in that section is "underinsurance." California Insurance Code § 779.2 defines "indebtedness" as "the total amount payable by a debtor to a creditor in connection with a loan or other credit transaction." Arguably, California allows for the "total of payments" method.
COLORADODisputed. Colorado Code § 5-4-202(1)(a) (1963, current as of 1995) provides that the amount of credit life insurance "may not initially exceed debt and, if the debt is payable in instalments, may not at any time exceed the greater of the scheduled or actual amount of the debt...." Section 10-10-103 (current through all 1995 First Regular Session laws) defines indebtedness as "the total amount payable by a debtor to a creditor in connection with a loan or other credit transaction." Colorado, like California, appears to be more concerned with too little coverage. Administrative Code of Insurance § 4-9-2.A. (current with amendments received August 30, 1995) states:
"Minimum Insurance Amounts. For other than monthly outstanding balance coverage, the amount of credit insurance at any point in the insurance coverage can never bear a lesser percentage to the scheduled outstanding balance than the

*188 APPENDIX TO SPECIAL OPINION OF CHIEF JUSTICE HOOPER: LIST OF STATES' POSITIONS ON CREDIT LIFE INSURANCE RATESContinued
percentage that the original amount of coverage bears to the initial loan balance. If the credit insurance will not extinguish the scheduled amount of indebtedness or outstanding balance, whichever is less, at any point in the insurance coverage period, or remit an amount at least equal to the minimum required indebtedness payment, a notice ... must appear on the certificate or application...."
Colorado does not prohibit the "total of payments" method.
CONNECTICUTDisputed. Connecticut Code § 38a-648(a) (1991; current through end of 1994 Nov. Spec. Sess.) provides that the total of credit life insurance "shall not exceed the initial indebtedness." Further, "[w]here an indebtedness repayable in substantially equal instalments is secured by an individual policy of credit life insurance, the amount of insurance shall at no time exceed the scheduled amount of indebtedness and, where secured by a group policy of credit life insurance, shall at no time exceed the amount of unpaid indebtedness." The greater concern is with the sufficiency of the insurance, not the excess. Section 36a-565 (current through end of 1995 October Special Session) states: "In the case of credit life insurance, the amount of the insurance shall be sufficient to pay the total balance of the loan due on the date of the insured's death." Connecticut allows the "total of payments" method.
DELAWAREDisputed. Delaware Code § 3704(a)(1) and (2) (1953, current as of 1994) limit the amount of credit life insurance to no more than the "initial indebtedness" or, where an indebtedness is repayable in substantially equal installments, "the scheduled or actual amount of unpaid indebtedness, whichever is greater." The "scheduled ... amount of indebtedness" would refer to the total of payments left in the case of an addon/precomputed interest note.
District of ColumbiaThe defense does not contend the District of Columbia uses "total of payments." And no wonder. D.C.Admin.Reg. title 16, § 325 (current with

APPENDIX TO SPECIAL OPINION OF CHIEF JUSTICE HOOPER: LIST OF STATES' POSITIONS ON CREDIT LIFE INSURANCE RATESContinued
amendments received through December 6, 1995) uses a special term of art that other jurisdictions allowing "total of payments" do not use. It states: "The amount of credit life insurance shall not, at any time, exceed the greater of the scheduled or actual unpaid `TIME PRICE BALANCE.'" While I am not sure of the meaning of the term "time price balance," it appears reasonable that if the District prohibits the "total of payments" method, it would need to distinguish that rule from other jurisdictions that allow it.
FLORIDABoth sides in this case agree that Florida uses the "total of payments" method. The language of its statute is very close to that of the Alabama statute. Florida Code § 627.679(1)(a) (current as of 1996), reads as follows:
"The amount of credit life insurance written under one or more policies shall not exceed by more than $5 the total of the payments of the specific contracts of indebtedness in connection with which it is written, when the indebtedness is repayable in substantially equal installments or in one installment or a single payment."
(Emphasis added.) Florida uses the words "total of the payments."
GEORGIADisputed. Georgia Code § 33-31-4(a) (1978, current as of 1995) limits the amount of credit life insurance to the amount of "indebtedness." It states:
"Where indebtedness repayable in substantially equal installments is secured by an individual policy of credit life insurance, the amount of insurance shall not exceed the approximate unpaid indebtedness on the date of death and, where secured by a group policy of credit life insurance, shall not exceed the exact amount of unpaid indebtedness on that date."
Georgia law provides a remedy for the insurance coverage being more than that needed to cover the outstanding insured loan balance. Such excess insurance is to be paid to the beneficiary named by the borrower, someone other than the creditor, or to the borrower's estate. Therefore, Georgia

*189 APPENDIX TO SPECIAL OPINION OF CHIEF JUSTICE HOOPER: LIST OF STATES' POSITIONS ON CREDIT LIFE INSURANCE RATESContinued
contemplates an excess. See Georgia Regulations 12-1-11-.01(c) and 120-2-27-.09 (current with amendments received through January 31, 1995). See Martin v. Commercial Securities Co., 539 F.2d 521 (5th Cir. 1976). Georgia does not prohibit the "total of payments" method. However, see Vulcan Life & Accident Ins. Co. v. United Banking Co., 118 Ga.App. 36, 162 S.E.2d 798 (1968).
HAWAIIThe plaintiff claims that Hawaii uses "total of payments." Hawaii's statute uses substantially the same wording as Alabama's statute. Instead of "approximate unpaid balance of the loan," Hawaii uses the phrase "the scheduled or actual amount of unpaid indebtedness." The phrases are not significantly different in meaning.
IDAHODisputed. Idaho Code § 41-2306(1)(a) and (b) (current through end of 1995 Regular Session) limits the total amount of credit life insurance to "initial indebtedness," or "[i]n cases where an indebtedness is repayable in substantially equal instalments, the amount of insurance shall at no time exceed the scheduled or actual amount of unpaid indebtedness, whichever is greater." Idaho Administrative Code IDAPA 18, Title 1, Chapter 61, § 004 (current with amendments received through October 25, 1995) defines the term "indebtedness." "`Indebtedness' means the total amount payable by a debtor to a creditor in connection with a loan or other credit transaction." IDAPA 18.01.61.014 refers to "Gross CoverageDecreasing term." Idaho does not prohibit the "total of payments" method. See Maxwell v. Cumberland Life Ins. Co., 113 Idaho 808, 748 P.2d 392 (1987).
ILLINOISDisputed. Ill. St. Ch. 73, p. 767.54 (approved December 21, 1995) uses the same language that several other states use. That statute states: "The amount of credit life insurance shall not exceed the initial indebtedness. Where an indebtedness is repayable in substantially equal installments, the amount of insurance shall at no time exceed the scheduled or actual amount of unpaid indebtedness, whichever is greater." Illinois Administrative Code Title 50,

APPENDIX TO SPECIAL OPINION OF CHIEF JUSTICE HOOPER: LIST OF STATES' POSITIONS ON CREDIT LIFE INSURANCE RATESContinued
§ 951.10(a) (current with amendments received through December 29, 1995) provides that "only decreasing term insurance may be written in connection with an indebtedness which is repayable in substantially equal installments." Section 951.10(c) states that the "amount of insurance should at no time exceed the scheduled or actual amount of unpaid indebtedness, whichever is greater." Section 951.40 (current with amendments received through December 29, 1995) defines "indebtedness" as the "total amount repayable including principal, interest and finance charges." Illinois does not prohibit the "total of payments" method.
INDIANADisputed. Indiana Code § 24-4.5-4-202(1)(a) (added 1983) limits the total amount of credit life insurance to "the debt" and "if the debt is payable in installments, [the amount of insurance] may not at any time exceed the greater of the scheduled or actual amount of the debt." Section 27-8-4-2 (current through end of 1995 regular session) defines "indebtedness" as the "total amount payable by a debtor to a creditor in connection with a loan or other credit transaction." It does not appear that Indiana prohibits the "total of payments" method. See Chesak v. Northern Indiana Bank & Trust Co., 551 N.E.2d 873 (Ind.App.1990).
IOWABoth sides agree that Iowa uses "total of payments."
KANSASDisputed. Kansas Code § 16a-4-202(1)(a) (current as of 1988) limits credit life insurance to no more than "the debt" and if the debt is "payable in installments," no more than "the greater of the scheduled or actual amount of the debt." See ITT Life Insurance Corp. v. Farley, 783 F.2d 978 (10th Cir.1986), cert. denied, 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986). Kansas does not appear to prohibit the "total of payments" method.
KENTUCKYDisputed. Kentucky Code § 304.19-040(1) (current through end of 1995 3d Executive Session) limits the amount of credit life insurance to no more than "the total amount repayable under the contract of indebtedness and, where an indebtedness is

*190 APPENDIX TO SPECIAL OPINION OF CHIEF JUSTICE HOOPER: LIST OF STATES' POSITIONS ON CREDIT LIFE INSURANCE RATESContinued
repayable in substantially equal installments, the amount of insurance shall at no time exceed the scheduled or actual amount of unpaid indebtedness, whichever is greater." Section 304.19-020 (current through end of 1995 3d Executive Session) defines "indebtedness" as "the total amount payable by a debtor to a creditor in connection with a loan or other credit transaction." Kentucky does not prohibit the "total of payments" method.
LOUISIANABoth sides agree that Louisiana uses "total of payments."
MAINEThe defense does not claim that Maine uses "total of payments."
MARYLANDThe plaintiff concedes that Maryland uses "total of payments." See Blickenstaff v. Bankers Mortgage Co., 266 Md. 7, 291 A.2d 480 (1972).
MASSACHUSETTSThe defense does not claim that Massachusetts uses "total of payments."
MICHIGANDisputed. M.C.L.A. 550.605, § 5 (current through P.A.1995) uses terminology substantially similar to that used in Alabama's statute"The amount of credit life insurance shall not exceed the indebtedness. Where indebtedness is secured ... by a group policy of credit life insurance [the amount of insurance] shall not exceed the exact amount of unpaid indebtedness on such date." Also, Mich. Admin.Code reg. 550.208 (current with amendments received through August 31, 1995) implies that any excess above what is needed to pay off the debt should be paid "to the beneficiary, other than the creditor, named by the debtor, or to the debtor's estate:...." The excess in that case is defined as "the amount of the benefits in excess of the amount required to repay the indebtedness after crediting any unearned interest or finance charges." M.C.L.A. 550.603, "Definitions," § 3.(5) (current through P.A.1995), defines "indebtedness" as "the total amount payable by a debtor to a creditor in connection with a loan or other credit transaction." (Emphasis added.) Relying on Opinions of the Attorney General 1963-1964, No. 4334, p. 475, the statute goes

APPENDIX TO SPECIAL OPINION OF CHIEF JUSTICE HOOPER: LIST OF STATES' POSITIONS ON CREDIT LIFE INSURANCE RATESContinued
on to state that the "[w]ord `indebtedness' as used in this section and § 550.605, is unpaid principal and interest accruing at any point in time during life of loan." (Emphasis added.) Michigan allows the "total of payments" method.
MINNESOTAThe defense does not claim that Minnesota uses "total of payments."
MISSISSIPPIThe defense does not claim that Mississippi uses "total of payments."
MISSOURIBoth sides agree that Missouri uses "total of payments."
MONTANADisputed. MCA 33-21-202 (current through 1993 session) has language similar to that of Alabama's statute: "The initial amount of credit life insurance may not exceed the total amount repayable under the contract of indebtedness." What the term "indebtedness" seems to include depends on whether the loan is agricultural, educational, etc. The amicus brief of the Alabama Trial Lawyers Association quotes this statute but in doing so omits an interesting phrase: "whichever is greater." The full quote from the statute is: "If an indebtedness is repayable in substantially equal installments, the amount of credit life insurance may not exceed the scheduled or actual amount of unpaid indebtedness on the date of death, whichever is greater." Subparagraph (a) states, "The amount of credit life insurance written in connection with: (a) a credit transaction repayable over a term in excess of 63 months or, at the option of the insurer, for a shorter term may not exceed the actual amount of unpaid indebtedness on the date of death, excluding any: (i) unearned interest or finance charges; and (ii) delinquency or extension exceeding 4 months...." While subparagraph (a) is difficult to interpret, it does not seem rational that the amount of indebtedness should exclude any delinquency exceeding four months, as the ATLA amicus brief seems to indicate it does.
NEBRASKABoth sides agree that Nebraska uses "total of payments." See Warner

*191 APPENDIX TO SPECIAL OPINION OF CHIEF JUSTICE HOOPER: LIST OF STATES' POSITIONS ON CREDIT LIFE INSURANCE RATESContinued
v. Reagan Buick, Inc., 240 Neb. 668, 483 N.W.2d 764 (1992).
NEVADABoth sides agree that Nevada uses "total of payments."
NEW HAMPSHIREDisputed. R.S.A. § 408-A:4 (current through end of 1994 regular session) uses terminology similar to that of Alabama's statute: "I. The amount of CREDIT LIFE INSURANCE shall not exceed the initial indebtedness. Where an indebtedness repayable in substantially equal installments is secured by an individual policy of CREDIT LIFE INSURANCE, the amount of insurance shall at no time exceed the scheduled amount of indebtednes..." Of comparable importance is paragraph II., which deals with "Credit Accident and Health Insurance":
"The total amount of indemnity payable by credit accident and health insurance in the event of disability, as defined in the policy, shall not exceed the aggregate of the periodic scheduled unpaid installments of the indebtedness; and the amount of each periodic indemnity payment shall not exceed the original indebtedness divided by the number of periodic installments."

(Emphasis added.) While § 408:15, paragraph II.(d) (current through Chapter 309 of 1995 Regular Session)"The amount of insurance on the life of any debtor shall at no time exceed the amount owed by him which is repayable in installments to his creditor."is interpreted by the ATLA amicus brief as clearly establishing a policy against the "total of payments" method of determining the amount of credit life insurance, New Hampshire regulation 1201.04(j) (current with amendments received through February 29, 1996) indicates otherwise: "If an indebtedness is prepaid by the proceeds of a CREDIT LIFE INSURANCE policy covering the debtor ..., then it shall be the responsibility of the insurer to see that the following refunds are paid to the insured debtor, if living, or the beneficiary, other than the creditor, named by the debtor or to

APPENDIX TO SPECIAL OPINION OF CHIEF JUSTICE HOOPER: LIST OF STATES' POSITIONS ON CREDIT LIFE INSURANCE RATESContinued
the debtor's estate: ... (3) In either case, the amount of the benefits in excess of the amount required to repay the indebtedness after crediting any unearned interest or finance charges." Why would there be any excess above the amount required to repay the indebtedness unless New Hampshire law allowed there to be an excess, i.e., unless it used the "total of payments" method of determining the amount?
NEW JERSEYThe plaintiff does not dispute the claim by the defense that New Jersey uses "total of payments." See Sherman v. Citibank (South Dakota), N.A., 143 N.J. 35, 668 A.2d 1036 (1995), judgment vacated, ___ U.S. ___, 116 S.Ct. 2493, 135 L.Ed.2d 186 (1996); Trico Mortgage Co. v. Penn Title Ins. Co., 281 N.J.Super. 341, 657 A.2d 890, 896, cert. den., 142 N.J. 456, 663 A.2d 1363 (1995).
NEW MEXICOThe plaintiff does not dispute the claim by the defense that New Mexico uses "total of payments."
NEW YORKNot mentioned by either side.
NORTH CAROLINANot mentioned by either side.
NORTH DAKOTABoth sides agree that North Dakota uses "total of payments."
OHIODisputed. Ohio Code § 3918.04(A) (current as of 1995) uses terminology similar to that of Alabama's statute: "The amount of credit life insurance shall not exceed the initial indebtedness [and] where secured by a group policy of credit life insurance, shall at no time exceed the amount of unpaid indebtedness." Again, this statute is at best ambiguous, until one looks to the regulations. OH ADC XXXX-X-XX(C)(1)(j) (current through March 31, 1996) states:
"Amount of CREDIT LIFE INSURANCE: (i) In connection with loans or other credit transactions of sixty months or less, the amount of CREDIT LIFE INSURANCE shall not exceed the scheduled or actual amount of indebtedness, whichever is greater. (ii) For loans or

*192 APPENDIX TO SPECIAL OPINION OF CHIEF JUSTICE HOOPER: LIST OF STATES' POSITIONS ON CREDIT LIFE INSURANCE RATESContinued
other credit transactions exceeding sixty months the amount of CREDIT LIFE INSURANCE shall not exceed the net indebtedness, exclusive of unearned finance charges."
Therefore, one can see by comparison of (i) and (ii) that the Ohio definition of "indebtedness" is not "exclusive of unearned finance charges" unless stated otherwise. See Cincinnati Central Credit Union v. Harper, 70 Ohio Misc.2d 80, 652 N.E.2d 10 (1995). Ohio allows the "total of payments" method.
OKLAHOMADisputed. The Oklahoma statute, Title 14A § 4-202 (effective 1969), also has language similar to that of the Alabama statute: "the amount of insurance may not initially exceed the debt." The Oklahoma regulations clarify the definition of the word "debt." OAC 365:10-5-66 (current with amendments received through October 13, 1995) states: "The initial amount of insured indebtedness to which the rate is applied shall not exceed the aggregate of the insured portion of the periodic scheduled unpaid installments of the indebtedness." That means one adds up the remaining installment payments to determine the initial indebtedness, i.e., Oklahoma uses the "total of payments" method. See National Interstate Life Insurance Co. v. Thomas, 630 P.2d 779 (Okla.1981); First National Bank of Porter v. Howard, 550 P.2d 561 (Okla.1976).
OREGONBoth sides agree that Oregon uses "total of payments."
PENNSYLVANIADisputed. Pennsylvania regulation 73.3(b) (obtained from 1996 Westlaw research) states: "The amount charged a debtor for any credit life insurance subject to this chapter shall not exceed the premiums charged by the insurer, as computed at the time the charge to the debtor is determined." This regulation is not very detailed. It does not explicitly address whether the insurance is based upon principal or principal and interest.
However, there are cases in Pennsylvania that are clear on this matter. In Dear v. Holly Jon Equipment Co., 283 Pa.Super. 74, 78, 423 A.2d 721, 723 (1980), the Court said,

APPENDIX TO SPECIAL OPINION OF CHIEF JUSTICE HOOPER: LIST OF STATES' POSITIONS ON CREDIT LIFE INSURANCE RATESContinued
"`[s]uch finance charge [for a car installment loan] shall be computed on the principal amount financed as determined under § 14-B-6 of this Act,' which provides that the `[p]rincipal amount financed ... shall be the total of the unpaid cash price balance plus the insurance premium costs plus other costs, for which the seller agrees to extend credit to the buyer.' 69 P.S. § 614 B(6)." The entire case deals with whether an "add-on" type of contract for the sale of an automobile violated the Pennsylvania proscription against excessive finance charges. The court found that it did not. Dear was quoted and followed in Skolnick v. Ford Motor Credit Co., 319 Pa.Super. 83, 465 A.2d 1064 (1983), appeal dismissed, 505 Pa. 608, 482 A.2d 1275 (1984).
RHODE ISLANDDisputed. Rhode Island Code § 27-30-4 (current as of 1994), states: "(a) The amount of credit life insurance shall not exceed the indebtedness. (b) Where an indebtedness repayable in substantially equal installments is secured by ... a group policy of credit life insurance, [the amount of credit life insurance] shall at no time exceed the amount of unpaid indebtedness." Reg. IX-Section 2-(11)(a) (current with amendments through October 20, 1995): "Credit life insurance may provide gross coverage, or net coverage, at the option of the insurer, for terms not exceeding 61 months.... The amount of credit life insurance provided to cover a lessee shall not exceed the amount or amounts that the lessee's successor, or his estate, becomes obligated to pay, either in one sum or in periodic payments, on the death of the lessee." The amount that the lessee is obligated to pay is not simply the principal.
Also, Reg. IX-Section 2-(7) (current with amendments through October 20, 1995) states "`Indebtedness' means `total amount repayable including principal, interest and finance charges.'" The word "indebtedness" is used in the Alabama regulations, but it is not defined. Here it is defined as including not only principal but also interest. This

*193 APPENDIX TO SPECIAL OPINION OF CHIEF JUSTICE HOOPER: LIST OF STATES' POSITIONS ON CREDIT LIFE INSURANCE RATESContinued
helps in answering the only question in this case: Whether Alabama law authorizes lenders to base the amount of credit life insurance on (1) the principal; or (2) on the principal plus interest.
The Rhode Island Code section uses language similar to that of the Alabama statute and the other states that allow the "total of payments" method. It states: "The amount of credit life insurance shall not exceed the indebtedness. (b) Where an indebtedness repayable in substantially equal installments is secured by an individual policy of credit life insurance the amount of insurance shall at no time exceed the scheduled amount of indebtedness and, where secured by a group policy of credit life insurance, shall at no time exceed the amount of unpaid indebtedness." Rhode Island allows the "total of payments" method.
SOUTH CAROLINADisputed. South Carolina Code § 37-4-202(1)(a) (current through end of 1993 regular session) states: "In the case of consumer credit insurance providing life coverage, the amount of insurance may not initially exceed the debt and, if the debt is payable in installments, may not at any time exceed the greater of the scheduled or actual amount of the debt." It appears that the term "debt" is the same as "indebtedness," which is used in the Alabama regulation. Also, from § 37-4-202-(1)(b) (current through end of 1993 regular session), it appears that "debt" is defined as including principal and interest: "In the case of any other consumer credit insurance [i.e., insurance in transactions other than leases], the total amount of periodic benefits payable may not exceed the total of scheduled unpaid installments of the debts...." (Emphasis added.) A debtor paying the "unpaid installments of the debts" is not just paying off portions of the principal, but is also paying off interest. Interest is nothing more than a fee that is paid for allowing a person to take possession of a piece of property before actually paying the entire value of the property.

APPENDIX TO SPECIAL OPINION OF CHIEF JUSTICE HOOPER: LIST OF STATES' POSITIONS ON CREDIT LIFE INSURANCE RATESContinued
The South Carolina Code states that "the amount of insurance may not initially exceed the debt and, if the debt is payable in installments, may not at any time exceed the greater of the scheduled or actual amount of the debt." § 37-4-202. This is the typical language used in the codes of states allowing the "total of payments" method.
SOUTH DAKOTABoth sides agree that South Dakota uses "total of payments."
TENNESSEEDisputed. Tennessee Code § 45-5-305(3)(A) (current as of 1993) states: "Life insurance shall be in an amount which does not exceed the total amount of the loan and shall be for a period which does not exceed the term of the loan...." (Emphasis added.) Section 45-2-1106(1)(B) (current through end of 1995 session) states: "The initial amount of credit life insurance shall not exceed the total amount repayable under the total amount of the indebtedness." (Emphasis added.) Later, "indebtedness" is defined as "the total amount payable by a debtor to a creditor in connection with a loan or other credit transaction." (Emphasis added.) Tennessee Comprehensive Rules and Regulations, Title 0780-1-4-.01(1)(f): "`Indebtedness' means the total amount payable by a debtor to a creditor in connection with a loan or other credit transaction...."
Section 56-7-907(a) (current through end of 1995 session) states: "The initial amount of credit life insurance issued in connection with a specific loan or other credit transaction shall not exceed the total amount repayable under the contract of indebtedness, which amount repayable may include the amount of the loan commitment by the creditor." (Emphasis added.) What is "indebtedness?" Tennessee Code § 56-7-904 (current through end of 1995 session) gives definitions: "As used in §§ 56-7-903-56-7-912 [including § 56-7-907] ... `Indebtedness' means the total amount payable by a debtor to a creditor in connection with a loan or other credit transaction." (Emphasis added.) Tennessee Code § 56-7-904(8) (current through end of 1995 session).

*194 APPENDIX TO SPECIAL OPINION OF CHIEF JUSTICE HOOPER: LIST OF STATES' POSITIONS ON CREDIT LIFE INSURANCE RATESContinued
Also, Regulation 0780-1-4-.05(1) (current with amendments received through May 15, 1995) states, "The initial amount of credit life insurance issued in connection with a specific loan or other credit transaction shall not exceed the total amount repayable under the contract of indebtedness...." (Emphasis added.)
The Tennessee Code states: "The amount and type of insurance which may be required or accepted hereunder shall bear a reasonable relation to the existing hazard and risk of loss and shall be subject to the following terms and conditions: (A) Life insurance shall be in an amount which does not exceed the total amount of the loan and shall be for a period which does not exceed the term of the loan." § 45-5-305(3) (current as of 1993). (Emphasis added.) This language in (A) is almost the same as the language of the Alabama statute, and, as discussed above, it seems to include interest. Tennessee does not prohibit the "total of payments" method. See In re Estate of I dell, [Ms. 03A01-9309-PB-00319, February 18, 1994], 1994 WL 49061 (Tenn.App.1994); Cooper v. Plateau Insurance Co., [Ms. 02A01-9208-CH-00226, March 17, 1993], 1993 WL 73868 (Tenn.App. 1993); Baggett v. Crown Automotive Group, Inc., [Ms. 89C-566, May 22, 1992], 1992 WL 108710 (Tenn.App.1992); Ritchie v. Cavalry Banking Fed. Savings & Loan Ass'n, [Ms. 01-A-01-9001-CH00044, August 24, 1990], 1990 WL 121565 (Tenn.App.1990) (unpublished); Phipps v. Watts, 781 S.W.2d 863, 864 (Tenn.App.1989) (credit life paid off $10,713.55 debt outstanding on car and $1,643.31 excess was paid to the estate); Nold v. Selmer Bank & Trust Co., 558 S.W.2d 442 (Tenn.App.1977).
TEXASBoth sides agree that Texas uses "total of payments." According to Texas Code § 5069-3.18, the amount of credit life insurance may not exceed "the total amount repayable under the contract of indebtedness and, where an indebtedness is repayable in substantial equal installments, the amount of

APPENDIX TO SPECIAL OPINION OF CHIEF JUSTICE HOOPER: LIST OF STATES' POSITIONS ON CREDIT LIFE INSURANCE RATESContinued
insurance shall at no time exceed the scheduled or actual amount of unpaid indebtedness, whichever is greater." This language is similar to that used by the other states that allow the "total of payments" method.
UTAHDisputed. Utah Code § 31A-22-804(1) (current through end of 1995 General and First Special Sessions) states: "Except as provided under Subsection (2) [dealing with nonapplicable education or agricultural loans], the initial amount of credit life insurance on the life of any one debtor may not exceed the total amount repayable under the contract of indebtedness. Where an indebtedness is repayable in substantially equal periodic installments, the amount of insurance may not exceed the scheduled or actual amount of unpaid indebtedness, whichever is greater." What is indebtedness? Indebtedness is defined under § 31A-22-802(6) (current through end of 1995 General and First Special Sessions) as "the total amount payable by a debtor to a creditor in connection with a credit transaction, including principal, finance charges and interest." (Emphasis added.) Clearly, Utah allows for the "total of payments" method.
VERMONTThe defense does not claim that Vermont uses "total of payments."
VIRGINIAThe defense does not claim that Virginia uses "total of payments."
WASHINGTONThe defense does not claim that Washington uses "total of payments."
WEST VIRGINIADisputed. West Virginia Code of State Rules, § 114-6-3(3.1) (current with amendments received through March 31, 1995): "Amounts payablecredit life insurance. The initial amount of credit life insurance shall not exceed the total amount repayable under the contract of indebtedness and, where an indebtedness is repayable in substantially equal installments, the amount of unpaid indebtedness, whichever is greater." (Emphasis added.) What is "indebtedness?" "`Indebtedness' means the total amount payable by a debtor to a creditor in connection with a loan or other credit

*195 APPENDIX TO SPECIAL OPINION OF CHIEF JUSTICE HOOPER: LIST OF STATES' POSITIONS ON CREDIT LIFE INSURANCE RATESContinued
transaction." West Virginia Insurance Regulation § 114-6-2.5 (current with amendments received through March 31, 1995). (Emphasis added.) Use of the word "total" indicates that West Virginia does not prohibit the "total of payments" method. See Cook v. Lilly, 158 W.Va. 99, 208 S.E.2d 784 (1974); Carper v. Kanawha Banking & Trust Co., 157 W.Va. 477, 207 S.E.2d 897 (1974).
WISCONSINDisputed. The following regulation, Wisconsin Admin.Code, § 424.208(1) (current through 1995 Act 26, published July 19, 1995), shows that the amount of credit life insurance is based upon the principal and interest, because it discusses the refund: "The initial amount of credit life insurance shall not exceed the total amount repayable under the contract of indebtedness however the indebtedness may be repayable, but: (a) In cases where an indebtedness is repayable in substantially equal instalments, the amount of insurance shall at no time exceed the scheduled or actual amount of unpaid indebtedness, which is greater...." Wisconsin Admin.Code of Insurance, § 3.25(9)(j) (current with amendments received through March 1, 1995), states:
"If an indebtedness is prepaid by the proceeds of a credit life insurance policy covering the debtor or by a lump sum payment of a disability claim under a credit insurance policy covering the debtor, then it shall be the responsibility of the insurer to see that the following are paid to the insured debtor, if living, or the beneficiary, other than the creditor named by the debtor, or to the debtor's estate:
". . . .
"3. In either case, the amount of the benefits in excess of the amount required to repay the indebtedness after crediting any unearned interest or finance charges."
Wisconsin does not prohibit the "total of payments" method.

APPENDIX TO SPECIAL OPINION OF CHIEF JUSTICE HOOPER: LIST OF STATES' POSITIONS ON CREDIT LIFE INSURANCE RATESContinued
WYOMINGDisputed. "Indebtedness" is not explicitly defined. Wyoming Code § 26-21-104 (current through Chapter 212 of the General Assembly of the 53d Legislature) states: "The initial amount of credit life insurance shall not exceed the total amount repayable under the contract of indebtedness.... (b) If an indebtedness is repayable in substantially equal installments, the amount of insurance shall not exceed the scheduled or actual amount of unpaid indebtedness, whichever is greater." This statute is similar to Alabama's, which does not explicitly define "indebtedness." When does a financial institution give gratuitous loansloans without interest? What is the total amount of indebtedness, or money, that a debtor will pay to the creditor until the loan is retired? A debtor will pay back the money that he or she was lent, plus additional money. Therefore, the term "the original face amount of the specific contracts of indebtedness" refers not only to the amount of money that is lent, but to the interest as well.
Also, Code § 40-14-431(a)(i) (current through Chapter 212 of the General Assembly of the 53d Legislature) states:
"In the case of consumer credit insurance providing life coverage, the amount of insurance may not initially exceed the debt and, if the debt is payable in installments, may not at any time exceed the greater of the scheduled or actual amount of the debt."
Wyoming does not prohibit the "total of payments" method.

CONCLUSION
It is more than arguable that at least 42 states allow for the "total of payments" method of calculating the amount of insurance needed by the purchaser/debtor/insured.
MADDOX, Justice (dissenting).
Although I concurred in the result reached by this Court on original deliverance, I must now respectfully dissent. The facts clearly show that the defendants relied *196 upon administrative interpretations made by the State Insurance Department and the State Banking Department of Alabama's "Mini-Code," specifically, § 5-19-20(a), Ala. Code 1975, in administering credit sales involving insurance. Although these administrative interpretations may have been incorrect, the language of the statute itself is arguably ambiguous. The effect of today's decision is that a defendant can be punished for conduct that conformed to the interpretation of § 5-19-20(a), Ala.Code 1975, given by two separate state agencies.
One of the hallmarks of justice and fair play is that those performing a statutorily regulated activity should have the right to rely upon the interpretation of a state agency charged with the responsibility of administering the state regulatory scheme. This principle of justice and fairness is even more pronounced when conduct of a party could subject the party to a penalty or some other punishment. As the United States Supreme Court recently stated: "Elementary notions of fairness enshrined in this Court's constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose." BMW of North America, Inc. v. Gore, ___ U.S.___, ___, 116 S.Ct. 1589, 1591, 134 L.Ed.2d 809 (1996). See also Shaffer v. Heitner, 433 U.S. 186, 217, 97 S.Ct. 2569, 2586-87, 53 L.Ed.2d 683 (1977) (Stevens, J., concurring in the judgment) (although constitutional safeguards afforded to criminal defendants are not applicable to civil cases, due process requires notice before a civil penalty is imposed).
This Court has stated unequivocally that "in interpreting a statute, a court accepts an administrative interpretation of the statute by the agency charged with its administration, if the interpretation is reasonable" and that "[a]bsent a compelling reason not to do so, a court will give great weight to an agency's interpretations of a statute and will consider them persuasive." Ex parte State Department of Revenue, [Ms. 1950195, June 7, 1996] 683 So.2d 980, 983 (Ala.1996). (Citations omitted.) Likewise, the Supreme Court of the United States has held that when confronted with an ambiguous statutory provision it generally defers "to a permissible interpretation espoused by the agency entrusted with its implementation." Good Samaritan Hospital v. Shalala, 508 U.S. 402, 414, 113 S.Ct. 2151, 2159, 124 L.Ed.2d 368 (1993). See also National Railroad Passenger Corp. v. Boston & Maine Corp., 503 U.S. 407, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992); Department of the Treasury, IRS v. FLRA, 494 U.S. 922, 933, 110 S.Ct. 1623, 1629-30, 108 L.Ed.2d 914 (1990); K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291-92, 108 S.Ct. 1811, 1817-18, 100 L.Ed.2d 313 (1988).
Additionally, the persuasive effect of an administrative interpretation that has been in existence for a number of years is entitled to favorable consideration. In Robinson v. City of Montgomery, 485 So.2d 695, 697 (Ala. 1986), this Court noted that "`[t]he correct rule is that an administrative interpretation of the governmental department for a number of years is entitled to a favorable consideration by the courts,'" quoting Boswell v. Abex Corp., 294 Ala. 334, 336, 317 So.2d 317, 318 (1975). See also City of Birmingham v. AmSouth Bank, N.A., 591 So.2d 473 (Ala. 1991).
In conclusion, the record clearly shows that the administrative interpretation had been in effect for a number of years, that the defendant had relied upon the interpretation and that the defendant had no notice that its activities violated the Mini-Code. We further can take judicial notice that the Legislature, no doubt aware of this lawsuit, has amended the statute to remove any ambiguity.
Based on the foregoing, I must respectfully dissent.
NOTES
[1] McCullar's brief contains an error in its use of a quote from the C.S. Blackledge memo. The brief states that the "unpaid balance of the loan on an add-on precomputed note has clearly been defined by the State Banking Department as evidenced by the Blackledge Memo as `... the total of payments less paid installments and less refund or a credit for unearned charges.'" (Emphasis placed in quote by brief.) This is incorrect. The entire quote from Blackledge's memo is: "The original face amount of an add-on precomputed note is the total of payments and the unpaid principal balance of the loan at any time would be the total of payments less paid installments and less refund or credit for unearned charges." (Emphasis added.) The McCullar brief erroneously refers to the "unpaid balance" instead of the correct quote, "unpaid principal balance." The sentence from the memo, when read in context and in its entirety, supports the defendants' contention that the "total of payments" was acceptable to the Banking Department in 1981.
[2] The amicus curiae brief filed by the Alabama Trial Lawyers Association in opposition to the application for rehearing incorrectly asserts at p. 4 that "This Court's September 29 decision reflects the prevailing view held by 37 states."
[3] In an exchange during oral argument between the ATLA (Alabama Trial Lawyers Association) attorney and the Court regarding the manner in which other states treat credit life insurance, the ATLA attorney said that there were three categories of statesthose that clearly limit the amount of insurance to something less than the total of payments, those that clearly allow it, and those in between. With respect to that third group, he said, "Those in between have, some have language similar to Alabama. They're in the gray area, and there's been no either administrative ruling or any law that I can find, other than Arkansas is the only state." (Emphasis added.) Justice Houston asked a follow-up question: "You said that there are other states that fall into `gray area' that Alabama is in. Did you mean by that that this perhaps was ambiguous?" In his answer to that question, the ATLA attorney said that he meant these other "gray area" states had no clear judicial ruling "like McCullar." In other words, in the opinion of the attorney for ATLA, most of the states of the country have statutes with ambiguous language, and these other states' statutes are similar to Alabama's statute. However, Alabama's statute is not ambiguous, because it has received a "clear judicial ruling" in the very case he is arguing. This is circular reasoning at its finest, and it means no person or business is safe from retroactive changes in the law by this Court. It is akin to saying, "The law protects you from arbitrary punishment if you relied on the regulatory agency's interpretation of an ambiguous regulation, unless the Supreme Court has made the statute unambiguousretroactively." It represents the finest reasoning of Alice in Wonderland:

"`When I use a word,' Humpty Dumpty said, in a rather scornful tone, `it means just what I choose it to meanneither more nor less.'
"`The question is,' said Alice, `whether you can make words mean so many, different things.'"
Lewis Carroll, Through the Looking Glass, Chapter VI, Nelson Doubleday: Garden City, New York.